**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (*pro hac vice* pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC.,
BRILLIANT NATIONAL SERVICES, INC., L.A.
TERMINALS, INC., and SOCO WEST, INC.,

     Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC.,
BRENNTAG GREAT LAKES, LLC, BRENNTAG
MID-SOUTH, INC., BRENNTAG NORTH
AMERICA, INC., BRENNTAG NORTHEAST,
INC., BRENNTAG PACIFIC, INC., BRENNTAG
SOUTHEAST, INC., BRENNTAG SOUTHWEST,
INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL
CHEMICAL CO., LLC, MINERAL AND PIGMENT
SOLUTIONS, INC., THOSE PARTIES LISTED ON
APPENDIX A TO THE COMPLAINT, and JOHN
AND JANE DOES 1-1,000,

     Defendants.

Adv. Proc. No. 23-_____

**DEBTORS' VERIFIED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF (I) DECLARING THAT THE AUTOMATIC
STAY APPLIES TO SUCCESSOR LIABILITY CLAIMS AGAINST
NON-DEBTORS, (II) EXTENDING THE AUTOMATIC STAY TO SUCH CLAIMS,
(III) PRELIMINARILY ENJOINING SUCH CLAIMS, AND (IV) DECLARING THAT
<u>SUCCESSOR LIABILITY CLAIMS ARE PROPERTY OF THE DEBTORS' ESTATES</u>**

TO THE HONORABLE MICHAEL B. KAPLAN,
CHIEF JUDGE, UNITED STATES BANKRUPTCY COURT:

     Whittaker, Clark & Daniels, Inc. ("**WCD**") and its debtor affiliates (together with WCD,

"**Plaintiffs**" or the "**Debtors**"), the debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Chapter 11 Cases**") and plaintiffs in the above-captioned

adversary proceeding (this "**Adversary Proceeding**"), hereby allege as follows:

2

## NATURE OF THE ACTION

1.     The Debtors commenced the Chapter 11 Cases on April 26, 2023 to address and fairly resolve the following claims in an effective, efficient, and centralized forum under title 11 of the United States Code (the "**Bankruptcy Code**"): (i) existing and future tort claims against the Debtors alleging injuries resulting from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest (the "**Asbestos Claims**," and such claimants, the "**Asbestos Claimants**"); (ii) environmental litigation against the Debtors relating to the production or handling of hazardous materials which allegedly contaminated certain properties[2] (the "**Environmental Claims**," and such claimants, the "**Environmental Claimants**," and together with the Asbestos Claims and Asbestos Claimants, the "**Tort Claims**" and "**Tort Claimants**," respectively); (iii) claims against certain non-Debtor entities seeking to establish such entities' liability for Tort Claims on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors (the "**Successor Liability Claims**"); and (iv) indemnification or contribution claims against the Debtors with respect to any Successor Liability Claim (the "**Indemnification Claims**").[3]

2.     The Debtors are currently defendants in lawsuits across more than 30 different jurisdictions and have managed an active docket of asbestos lawsuits and environmental claims for close to 40 years.  The Debtors are not the result of divisive merger or any recent strategic corporate reorganization.  Instead, they are the same corporate entities whose historical operations

---

[2] For the avoidance of doubt, by the Adversary Proceeding, the Debtors are not seeking to stay or enjoin the negotiation of any Remedial Action Plan ("**RAP**") with respect to any Environmental Claim or any responsible party's obligation to perform in connection with any agreed upon RAP.

[3] Contemporaneously with the filing of this Complaint, the Debtors have filed the following motions (collectively, the "**Motions**"): (1) a motion for a preliminary injunction of the commencement, continuation, and settlement of Successor Liability Claims while the Chapter 11 Cases are pending; and (2) a motion for summary judgment in favor of the Debtors on Counts I, II, and IV of this Complaint.

(which concluded nearly 20 years ago) precipitated these Chapter 11 Cases.  Accordingly, it was the Debtors' sincere hope that filing for bankruptcy and the resulting imposition of the automatic stay, coupled with the successful defense of a motion to dismiss these Chapter 11 Cases, would provide the requisite breathing spell to negotiate and implement a consensual and comprehensive resolution of the Debtors' various liabilities.  Instead, the commencement, continuation and, most recently, settlement of Successor Liability Claims against Brenntag,[4] which purchased substantially all of the Debtors' operating assets in 2004 and which has indemnification rights[5] against certain Debtors, has continued apace.  Successor Liability Claims are property of the Debtors' estates and cannot and should not be pursued or compromised outside of these Chapter 11 Cases.

3.    The commencement, continued litigation, and piecemeal settlement of Successor Liability Claims against Brenntag and other non-Debtors in the tort system threatens the success of these Chapter 11 Cases.  In addition to potentially triggering the Debtors' indemnification obligations, Successor Liability Claims implicate the Debtors' business operations prior to the sale of substantially all of their operating assets in 2004 and require an initial determination of the Debtors' asbestos and environmental liabilities.  The continued prosecution of Successor Liability Claims in the tort system would require the Debtors to defend themselves no differently than with respect to stayed Tort Claims and would significantly deplete estate resources that could otherwise be used to fund a comprehensive resolution of these Chapter 11 Cases.

---

[4] Brenntag AG, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC, Coastal Chemical Co., LLC, and Mineral and Pigment Solutions, Inc. are referred to collectively herein as "**Brenntag**."

[5] Nothing in this Complaint shall constitute an admission as to the validity, extent, or priority of any Indemnification Claim asserted against the Debtors.  The Debtors reserve all rights and defenses as to such claims.

4.      The Debtors seek a declaration that section 362(a) of the Bankruptcy Code prohibits
the commencement, continuation, or settlement of any action by the defendants in the Adversary
Proceeding (collectively, the "**Defendants**")[6] seeking to hold the following entities liable for
Successor Liability Claims either because the automatic stay applies to such claims by its express
terms or because "unusual circumstances" warrant an extension of the automatic stay to such
claims: (i) certain of the Debtors' non-debtor affiliates (the "**Non-Debtor Affiliates**");
(ii) Brenntag and other non-Debtors that have been or may be alleged to be successors to, or alter
egos of, the Debtors (the "**Alleged Successors**"); and (iii) third-parties who may have contractual
or common law indemnification rights against the Debtors for the Successor Liability Claims
asserted against them (the "**Indemnified Parties**" and, collectively with Non-Debtor Affiliates
and the Alleged Successors, the "**Protected Parties**").[7]  The Debtors also seek an injunction under
section 105(a) of the Bankruptcy Code providing for the same relief while the Chapter 11 Cases
are pending.

5.      Finally, the Debtors seek a declaration that Successor Liability Claims are property
of the Debtors' estates that the Debtors have sole standing to pursue and compromise while the
Chapter 11 Cases are pending.  Successor Liability Claims are key estate assets that must be
preserved for the benefit of all creditors in these cases (including future claimants), rather than

---

[6]  The Defendants include Brenntag and plaintiffs or potential plaintiffs in lawsuits that seek to hold, or may seek to
hold, one or more of the Protected Parties (defined below) liable for Successor Liability Claims.  These Defendants,
with the exception of Brenntag and the John and Jane Doe Defendants, are listed in Appendix A to this Complaint.
Appendix A identifies the civil action number (where available) for each lawsuit and the law firm representing each
of the Defendants on account of their claims.  The Debtors reserve the right to supplement, amend, or otherwise modify
Appendix A.  For the avoidance of doubt, the inclusion of a lawsuit on Appendix A is not an admission that such
Defendant holds a valid claim against either the Debtors or the Protected Parties.  The Debtors are only seeking to
prohibit Brenntag from settling Successor Liability Claims because, upon information and belief, Brenntag is the only
Protected Party that has been sued on account of Successor Liability Claims to date.  The Debtors reserve the right to
seek additional relief as to other Protected Parties in the future.

[7]  The Protected Parties are listed on Appendix B to this Complaint.  The Debtors reserve the right to seek to
supplement, amend, or otherwise modify the list of Protected Parties.

pursued by individual plaintiffs for their own private benefit. A global resolution of the Successor Liability Claims, along with the Tort Claims and Indemnification Claims, is essential to a successful outcome in the Chapter 11 Cases.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to entry of final orders or a final judgment by this Court in this Adversary Proceeding.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1409.

8.      The statutory bases for the relief requested herein are sections 105(a), 362(a), and 541(a) of the Bankruptcy Code and Bankruptcy Rules 7001 and 7065. The Debtors have made no prior request for the relief requested herein to this or any other court.

## THE PARTIES

9.      The Plaintiffs are the Debtors.

10.     WCD is a New Jersey corporation. *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 5] (hereinafter, the "**First Day Declaration**"), Ex. B.

11.     Brilliant National Services, Inc. ("**Brilliant**") is a Delaware corporation. *Id.*

12.     Soco West, Inc. ("**Soco**") is a Delaware corporation. *Id.*

13.     L.A. Terminals, Inc. ("**LAT**") is a California corporation. *Id.*

14.     Defendant Brenntag acquired substantially all of the operating assets of Debtors WCD, Brilliant, and Soco in connection with the 2004 Transactions (defined below). Brenntag is

6

a named defendant in a substantial number of actions alleging Successor Liability Claims, many of which also allege Tort Claims against one or more Debtors.

15.     Each named Defendant in <u>Appendix A</u> is a plaintiff in a pending Tort Claim against one or more Debtors or Successor Liability Claim against Brenntag.  *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc. in Support of Debtors' Complaint for Declaratory and Injunctive Relief and Related Motions* (hereinafter, the "**Meghji Declaration**"), ¶ 13.[8]

16.     Each of Defendants John and Jane Does 1-1,000 is a prospective plaintiff who, absent the relief requested herein, might seek to commence a Successor Liability Claim against one or more Protected Parties during the pendency of the Chapter 11 Cases.  *Id.* at ¶ 14.

17.     The Protected Parties include: (i) the Non-Debtor Affiliates (*i.e.,* Berkshire Hathaway, Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company, Resolute Management, Inc. and Ringwalt & Liesche Co.); and (ii) the Alleged Successors/Indemnified Parties (*i.e.,* Bain Capital, Brenntag AG, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC, Coastal Chemical Co., LLC, Mineral and Pigment Solutions, Inc., and Mineral Pigment Solutions, Inc.).  *Id.* at ¶ 15.

## FACTUAL BACKGROUND

**I.     Overview of the Debtors**

18.     The Debtors and their predecessors in interest were formed as early as 1918 and continued their operations as late as 2004.  First Day Declaration, ¶ 16.  Debtors WCD, Soco, and

---

[8] The Meghji Declaration was filed contemporaneously herewith.

LAT are direct or indirect subsidiaries of Debtor Brilliant.  *Id.*  From the time of their formation until substantially all of the Debtors' operational assets were sold, the Debtors' businesses consisted of storage and distribution of minerals and pigments, including talc, industrial chemicals, and solvents.  *Id.*  The Debtors ceased all operations by 2004 but continued their corporate existence to manage alleged asbestos and environmental liabilities related to the historical processing and distribution of cosmetic and industrial compounds.  *Id.* at ¶ 1.

19.    WCD was formed and began its operations as a supplier and distributor of minerals and pigments in New York in 1918.  First Day Declaration, ¶ 17.  At its zenith in the 1970s and 1980s, WCD operated one of the largest talc and industrial compound supply and distribution businesses in the United States.  *Id.* at ¶ 2.  In 1972, WCD reincorporated in New Jersey.  *Id.* at ¶ 17.  Brilliant (then named Brenntag Inc.), purchased the stock of WCD in 1988.  *Id.*  The operational assets of WCD were divested in 2004, as discussed further below, and the Debtors' current business activities largely relate to the management of Tort Claims alleged against WCD. *Id.*

20.    Soco's pre-2004 operations began as early as 1933, with the formation and incorporation of A.J. Lynch Co. ("**A.J. Lynch**"), which sold and distributed chemicals and raw materials to the paint industry.  First Day Declaration, ¶ 18.  Over multiple decades and through a series of strategic mergers and acquisitions and corporate name changes, Soco's historical operations expanded to include those of:

- Western Chemical & Manufacturing Co. ("**Western Chemical**"), which manufactured and distributed industrial chemicals and was incorporated in California in 1944;

- Dyce Chemical Inc. ("**Dyce Chemical**"), which repackaged and distributed industrial chemicals and was incorporated as Dyce Sales & Engineering Service Co. in Montana in 1957;

- Crown Chemical Corp. ("**Crown Chemical**"), which sold and distributed industrial chemicals and was incorporated as Petrosolve Corp. Ltd. in California in 1969; and

- Holchem Inc. ("**Holchem**"), which distributed chemicals and handled and recycled solvents and was incorporated in California in 1981.

*Id.* By 2001, after the culmination of various mergers, acquisitions, and name changes, A.J. Lynch, Western Chemical, Dyce Chemical, Crown Chemical, and Holchem became Brenntag West, Inc. ("**Brenntag West**"), an indirect subsidiary of Stinnes Corporation ("**Stinnes**"). *Id.*

21.    LAT was formed and began its operations importing and storing industrial chemicals in 1981. First Day Declaration, ¶ 19. Specifically, LAT operated a chemical storage and distribution terminal and bulk plant located within the Los Angeles Harbor. *Id.* LAT ceased its storage and distribution operations in 1994 and has largely resolved its liabilities through ordinary course claims management. *Id.* By 2001, through a series of stock purchases, LAT became a direct subsidiary of Stinnes. *Id.*

22.    Brilliant was formed and began its operations in 1977 as Stinnes Oil & Chemical Company, Inc. ("**Stinnes Oil & Chemical**"). First Day Declaration, ¶ 20. Stinnes Oil & Chemical was a subsidiary of Stinnes, and by 1982, Stinnes Oil & Chemical withdrew from the oil business and concentrated its business on the marketing, distributing, and trading of chemicals. *Id.* Stinnes Oil & Chemical changed its name twice: first to Soco Chemical Inc. in 1986, and then to Brenntag Inc., a direct subsidiary of Stinnes, in 1998. *Id.*

23.    As of 2004, the Debtors were owned by Stinnes or its affiliates, all of which were affiliates of Deutsche Bahn AG. First Day Declaration, ¶ 21. In 2004, substantially all of WCD's, Soco's, and Brilliant's operating assets were sold to entities under the umbrella of Brenntag North America, and those entities assumed certain non-asbestos and non-environmental liabilities related to the transferred assets (collectively, the "**2004 Transactions**"). *Id.* LAT was not involved in the 2004 Transactions, as it had previously ceased all operations. *Id.* The 2004 Transactions are discussed in greater detail below.

## II.      **The 2004 Transactions**

24.      The 2004 Transactions are governed by a Master Sale and Purchase Agreement (the "**MSPA**")[9] dated December 9, 2003, by and among Stinnes AG, Stinnes UK Limited, Stinnes, Brenntag Inc.,[10] and Schenker-BTL, S.A., as sellers ("**Sellers**"), Deutsche Bahn AG, as sellers' guarantor, and Blitz03-1303 GmbH, CM Komplementar 03-AP III. GmbH & Co. KG, PASR Siebente Beteiligungsverwaltung GmbH, and Fireball Holding France SAS, as purchasers ("**Purchasers**"). *See* MSPA at p. 13-14. The MSPA provided for, among other transactions, the sale of substantially all of the Debtors' operational assets pursuant to separate asset purchase agreements. *See* MSPA, § 2.11.

25.      Under the MSPA, the Sellers (which include Debtor Brilliant under the name Brenntag, Inc.) agreed, as joint and several debtors, subject to certain limitations and exclusions, to indemnify and hold harmless certain parties to the MSPA, including the Purchasers and their affiliates, from and against certain Environmental Liabilities. *See* MSPA, §§ 10.1, 10.9.

26.      With respect to Asbestos Claims, Debtors WCD and Soco agreed to indemnify certain parties to the MSPA, including the Purchasers, their affiliates, and certain related persons, from and against certain losses incurred in connection with any present or future Retained Subsidiary Asbestos Claims relating to the applicable Debtor or any alleged corporate predecessor-in-interest thereof. MSPA, §§ 12.1.1, 12.1.2.

---

[9] Capitalized terms used in this Section B but not defined herein shall have the meanings ascribed to such terms in the MSPA. A true and correct copy of the MSPA is attached as Exhibit F to the Meghji Declaration.

[10] As noted above, Brenntag Inc. would later become Debtor Brilliant.

27.    The above indemnification obligations with respect to the Retained Subsidiary Asbestos Claims were guaranteed by Debtor Brilliant and, if Brilliant is unable to financially satisfy any such claims, Stinnes.  MSPA, § 12.1.1, 12.1.2.

28.    Additionally, Brilliant and Stinnes agreed, as joint and several debtors, to indemnify and hold harmless certain parties to the MSPA, including the Purchasers, their affiliates, and certain related persons from and against certain losses incurred in connection with present or future Non-Retained Subsidiary Asbestos Claims.  *See* MSPA, §§ 12.1.5, 12.3.

29.    In furtherance of the transactions contemplated by the MSPA, certain Debtors entered into additional asset purchase agreements providing for the disposition of substantially all of their assets to certain US Asset Purchasers affiliated with Brenntag.  *See* MSPA, § 2.11.

30.    More specifically pursuant to that certain asset purchase agreement dated February 27, 2004 (the "**2004 Soco APA**"),[11] Soco (then named Brenntag West, Inc.) divested substantially all of its assets in exchange for approximately $44 million and the assumption of certain ongoing liabilities by the purchaser, Brenntag Pacific, Inc.  First Day Declaration, ¶ 22.  Pursuant to the 2004 Soco APA, Soco retained all liability for the Tort Claims and retained certain assets, including asbestos- and environmental- related insurance receivables and certain real estate.  *Id.* Following these transactions, on March 8, 2005, Soco changed its name from Brenntag West, Inc. to Soco West, Inc.  *Id.*

31.    Simultaneously, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "**2004 WCD APA**"),[12] WCD divested substantially all of its assets in exchange for

---

[11] A true and correct copy of the 2004 Soco APA is attached as Exhibit G to the Meghji Declaration filed contemporaneously with this Complaint.

[12] A true and correct copy of the 2004 WCD APA is attached as Exhibit H to the Meghji Declaration filed contemporaneously with this Complaint.

approximately $15.9 million and the assumption of certain ongoing liabilities by the purchaser, Mineral & Pigment Solutions Inc. First Day Declaration. ¶ 23. Pursuant to the 2004 WCD APA, WCD retained all liabilities as to the Tort Claims and retained certain assets, including asbestos- and environmental-related insurance receivables and certain real property. *Id.*

32.    Together with the execution of the 2004 Soco APA and the 2004 WCD APA, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "**Brilliant APA**,"[13] and together with the 2004 WCD APA and the 2004 Soco APA, the "**2004 Transaction Documents**"), Brilliant (then named Brenntag Inc.) engaged in an asset sale transaction with Brenntag North America. First Day Declaration, ¶ 24. In connection with this transaction, Brilliant terminated certain management fee agreements, resigned from certain LLC agreements, and divested its intellectual property assets in exchange for Brenntag North America's assumption of certain non-asbestos-related and non-environmental ongoing liabilities, in addition to certain other consideration and the consideration provided under the 2004 WCD APA and 2004 Soco APA. *Id.* Contemporaneously with the execution of the 2004 Brilliant APA, Brilliant changed its name from Brenntag Inc. to Brilliant National Services, Inc. *Id.*

33.    The consideration the Debtors received under the 2004 Transaction Documents remained on the Debtors' books to satisfy the Tort Claims. First Day Declaration, ¶ 25.

## III.    The 2007 NICO Equity Sale

34.    In December 2007, National Indemnity Company ("**NICO**")[14] agreed to purchase—and assigned to an affiliated entity, Ringwalt & Liesche Co. ("**Ringwalt**")—the equity

---

[13] A true and correct copy of the Brilliant APA is attached as Exhibit I to the Meghji Declaration filed contemporaneously with this Complaint.

[14] NICO and Ringwalt are affiliates of Berkshire Hathaway, Inc. None of Ringwalt, the Debtors' other indirect parent entities, NICO, or any other BHI affiliate were involved with the Debtors at the time the Debtors were conducting any of the historical business operations that gave rise to the Tort Claims. To date, none of the complaints alleging Tort

in Debtors Brilliant[15] and LAT (the "**2007 NICO Equity Sale**") pursuant to that certain stock

purchase agreement dated November 7, 2007 (the "**2007 SPA**").[16]  First Day Declaration, ¶ 3; *see*

*also* 2007 SPA, Preamble.  Pursuant to an assignment agreement dated December 12, 2007, NICO

assigned its right to receive the Debtors' equity interests to Ringwalt, which remains the direct

parent of Brilliant (and the indirect parent of the other Debtors) today.  First Day Declaration, ¶ 26.

IV.      **The Tort Claims**

      A.      **The Asbestos Claims**

35.      Asbestos Claimants first began alleging that the Debtors' chemical processing and

distribution operations were causally related to their asbestos-related injuries in 1979.  First Day

Declaration, ¶ 30.  In more recent years, such claims have engulfed the Debtors in litigation.  *Id.*

at ¶ 6.  Indeed, since 2007, the Debtors' asbestos and environmental liabilities have increased

materially as a result of the evolution of the tort litigation landscape, as the talc-asbestos theory of

liability has risen to prominence and major talc suppliers have availed themselves of chapter 11

protection, leaving the Debtors as a main litigation target.  *Id.* at ¶ 3.

36.      As of the commencement of the Chapter 11 Cases, the Debtors have been sued by

approximately 2,700 individual Asbestos Claimants, with over 1,000 actions generally alleging

exposure to asbestos- and talc- containing compounds and products arising from the Debtors'

historical processing and distribution of cosmetic and industrial talc currently pending.  First Day

Declaration, ¶¶ 6, 30.  The Debtors have been managing an active docket of cases across the United

---

Claims or Successor Liability Claims reviewed by the Debtors name these entities as defendants or allege that they
manufactured, distributed, or possessed any of the products at issue in the Tort Claims and Successor Liability Claims.

[15]  At the time of the 2007 NICO Equity Sale, Brilliant owned all of the outstanding capital stock of Eastech Chemical
Inc. and Debtors WCD and Soco.

[16]  Capitalized terms used in this Section C but not defined herein shall have the meanings ascribed to such terms in
the 2007 SPA.  A copy of the 2007 SPA is attached as Exhibit J to the Meghji Declaration filed contemporaneously
with this Complaint.

States for close to 40 years—a task that has recently become increasingly cumbersome to manage absent a centralized forum to achieve global resolution for the benefit of all Asbestos Claimants. *Id.* at ¶ 6.

37.    Notably, many of these actions name Brenntag as a defendant based on a theory that it is an alleged successor to, or alter ego of, the Debtors, and therefore is liable for Tort Claims. Meghji Declaration, ¶ 16.  For the reasons explained in the Motions, these Successor Liability Claims constitute property of the Debtors' estates that the Debtors have sole standing to pursue and compromise while the Chapter 11 Cases are pending.

38.    Based on the Debtors' review of approximately 1,500 complaints alleging Tort Claims against the Debtors or Successor Liability Claims against Brenntag, approximately 1,000 name Brenntag as a defendant based on a theory that it is an alleged successor to, or alter ego of, the Debtors.  Meghji Declaration, ¶ 16.  While the Debtors conceptually have no issue with the commencement, continuation, or settlement of claims against Brenntag that are independent of its association with the Debtors (*i.e.*, claims alleging injury resulting from business operations conducted by Brenntag following the 2004 Transactions for which the Debtors do not owe indemnification obligations), the Debtors have not identified a single complaint that differentiates such claims from claims against Brenntag related to its association with the Debtors (*i.e.*, Successor Liability Claims for which the Debtors may owe indemnification obligations to Brenntag).  *Id.*

39.    Dispositions of historical Asbestos Claims have varied significantly, from outright dismissal to judgments in excess of $76 million.[17]  First Day Declaration, ¶ 7.  Continued

---

[17] *See*, *e.g.*, Calif. Jury Awards Talc Plaintiff $76 Million; Case Settles Before Punitives Phase, HarrisMartin (Dec. 16, 2021), https://www.harrismartin.com/publications/1/asbestos/articles/28555/calif-jury-awards-talcplaintiff-76-million-case-settles-before-punitives-phase/#:~:text=OAKLAND%2C%20Calif.,plaintiff's%20risk%20of%20%20developing%20cancer.

prosecution of the Asbestos Claims has burdened the Debtors with substantial defense and litigation costs, depleting resources and delaying or limiting recoveries to any legitimate claimants for years to come. *Id.* Prior to commencing the Chapter 11 Cases, the Debtors were incurring up to $1,000,000 in monthly defense costs in connection with the Asbestos Claims. *Id.*

40.    The Debtors anticipate that continued litigation of Asbestos Claims would consume an enormous amount of the Debtors' remaining resources with unpredictable and potentially unfairly preferential outcomes for the Asbestos Claimants. *Id.* Accordingly, the Debtors commenced the Chapter 11 Cases to centralize and resolve the Asbestos Claims in one forum. *Id.* at ¶ 40.

### B.    The Environmental Claims

41.    Federal and state governmental entities and plaintiffs have pursued actions or brought claims against the Debtors alleging that the Debtors produced and handled hazardous materials that subsequently contaminated approximately 32 properties across at least 14 states. First Day Declaration, ¶ 33. These properties housed the Debtors' or their predecessors' historical chemical processing and distribution operations, including legacy solvent recovery, reclamation, and recycling, chemical storage, treatment, and distribution, and waste transfer activities. *Id.* Like the Asbestos Claims, Brenntag is alleged to be a responsible party under applicable environmental laws in connection with certain Environmental Claims. *See* Meghji Declaration, ¶ 16.

42.    The Debtors have actively engaged with both federal and state governmental entities with respect to responding to, investigating, monitoring, and remediating the alleged contamination of these properties. First Day Declaration, ¶ 34. The Debtors intend to resolve the Environmental Claims in the Chapter 11 Cases. *See* Meghji Declaration, ¶ 6.

## V.        The Chapter 11 Cases

43.        The Debtors commenced the Chapter 11 Cases on April 26, 2023 (the "**Petition Date**").  Meghji Declaration, ¶ 4.  Since the Petition Date, the Debtors have operated their businesses and managed their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  *Id.* at ¶ 5.  On May 8, 2023, the Court entered an order [Docket No. 72] authorizing procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  On May 24, 2023, the United States Trustee for the District of New Jersey (the "**U.S. Trustee**") appointed an official committee of talc claimants pursuant to section 1102(a)(1) of the Bankruptcy Code (the "**Committee**") [Docket No. 121].

44.        Following the Petition Date, the Debtors filed notices of suggestion of bankruptcy (the "**Bankruptcy Notices**") on the dockets of pending Tort Claims against the Debtors.  Meghji Declaration, ¶ 7.  The Bankruptcy Notices informed the applicable courts and the parties about the commencement of the Chapter 11 Cases and the application of the automatic stay to the assertion of Tort Claims against the Debtors.  *Id.*

45.        The Debtors sought bankruptcy protection due to the lack of any alternative mechanism to efficiently and equitably address the Tort Claims, Successor Liability Claims, and Indemnification Claims.  First Day Declaration, ¶ 35; *see also* Meghji Declaration, ¶ 8.  The continuing influx of Asbestos Claims and recent judgments have made clear that it is nearly impossible for the Debtors to obtain finality with respect to these claims absent the Chapter 11 Cases.  First Day Declaration, ¶ 35.

46.        Further, certain recent developments arising from the growing number of claimants pursuing talc manufacturers in the United States, including the significant increase in settlement demands with respect to cosmetic talc claims in the wake of recent verdicts such as those rendered

against Johnson & Johnson, have threatened to swiftly exhaust the Debtors' remaining assets, leaving the universe of potential future claimants without any remaining assets from which to collect. First Day Declaration, ¶ 36. The Debtors have become a main target for claimants asserting asbestos- and talc- based claims. *Id.*

47.    Prior to the Petition Date, litigation costs continued to drain the Debtors of resources that could be more efficiently allocated to a trust designed to process claims in a single forum and get money into the hands of legitimate claimants on a far more expedited basis than can be accomplished through sequential, expensive trials, all without the attendant risk of disparate judgments among Asbestos Claimants across the country. First Day Declaration, ¶ 40. Indeed, section 524(g) of the Bankruptcy Code provides such an effective, efficient, and equitable mechanism for the Debtors to address the Asbestos Claims in a single forum. *Id.*

48.    The Debtors intend to use the breathing spell and other tools afforded by chapter 11 of the Bankruptcy Code to establish one or more claims trusts consistent with the requirements of sections 105(a) and 524(g) of the Bankruptcy Code, and ultimately seek approval of a settlement as part of a chapter 11 plan. First Day Declaration, ¶ 10. The Debtors seek to efficiently administer their remaining assets to maximize recoveries for claimants. *Id.* Resolving the Tort Claims, Successor Liability Claims, and Indemnification Claims in a comprehensive manner will be the most efficient and equitable use of resources, expenses, and time and will inure to the benefit of all stakeholders—including both present and future Tort Claimants and Indemnified Parties. *Id.*

49.    Since commencing their Chapter 11 Cases, the Debtors have defeated a motion to dismiss the cases (*see* Docket No. 211)[18] and obtained the appointment of a future claims representative (*see* Docket No. 231). The Debtors are committed to engaging with claimant

---

[18] The Order denying the motion to dismiss is currently on appeal. *See* Docket Nos. 246, 247, 248.

representatives and key stakeholders to consensually resolve the Chapter 11 Cases, including

through a mediation process.  Meghji Declaration, ¶ 8.

50.     As set forth in the Debtors' *Schedules of Assets and Liabilities*, the Debtors had

combined cash and cash equivalents of approximately $76 million as of the Petition Date.  *See*

Docket Nos. 134, 135, 136, 137.  The Debtors intend to use these funds, as well as any funds

contributed by the Protected Parties as part of a comprehensive resolution of the Tort Claims,

Successor Liability Claims, and Indemnification Claims, to fund these Chapter 11 Cases, including

through a plan that equitably and finally resolves the Debtors' asbestos and environmental

liabilities.  Meghji Declaration, ¶ 8.

**VI.      The Need for the Requested Relief**

51.     The declaratory and injunctive relief sought in this Adversary Proceeding and the

related Motions is critical to the Debtors' ability to achieve a global resolution of the claims that

precipitated the Debtors' bankruptcy filings.  The Debtors cannot engage in meaningful global

settlement negotiations absent a broad stay/injunction of Successor Liability Claims against the

Protected Parties and a declaration that Successor Liability Claims are property of the Debtors'

estates.

52.     Successor Liability Claims are factually and legally predicated on the Debtors'

operations and therefore require an initial determination of the Debtors' asbestos and

environmental liabilities.  Moreover, the Debtors may owe indemnification obligations to certain

Protected Parties in connection with Successor Liability Claims.  Accordingly, the Debtors require

a declaration that the automatic stay prohibits the commencement, continuation, or settlement of

Successor Liability Claims or an injunction prohibiting such actions while the Chapter 11 Cases

are pending.  *See* Meghji Declaration, ¶¶ 10, 21-23.

53.    Subsequent to the Petition Date, at least 23 complaints alleging Successor Liability Claims against Brenntag have been filed, none of which differentiate as between Successor Liability Claims and claims against Brenntag that are independent of its association with the Debtors.  Meghji Declaration, ¶ 17.

54.    Moreover, plaintiffs have continued to prosecute existing Successor Liability Claims against Brenntag during the pendency of these Chapter 11 Cases.  Meghji Declaration, ¶ 18.  For example, in April 2022, Brenntag and the plaintiff in an action styled *Corey Tippin v. Brenntag Specialties, et al.*, Case No. 190062/2021 currently pending in the Supreme Court of New York (the "**Tippin Action**") stipulated to stay the prosecution of Successor Liability Claims unless and until WCD failed to satisfy a final judgment or filed for bankruptcy protection.[19] *Id.*  In response to the bankruptcy filings, on August 16, 2023, plaintiff filed a second amended complaint to proceed with the prosecution of Successor Liability Claims against Brenntag Specialties, LLC and Brenntag North America, Inc.  *Id.*

55.    Brenntag also recently settled two Successor Liability Claims in advance of upcoming trials that were continuing postpetition.  Meghji Declaration, ¶ 19.  On August 2, 2022, the Honorable Laura A. Seigle of the Superior Court of the State of California for the County of Los Angeles entered a Minute Order in an action styled *Alloway v. Almay, Inc., et al.*, Case No. 22STCV14241 (the "**Alloway Action**") that scheduled a jury trial against Brenntag to begin on September 11, 2023.  *Id.*  Brenntag settled the Successor Liability Claims in the Alloway Action on or about August 11, 2023.  *Id.*

56.    On March 16, 2023, the Honorable Jean H. Toal of the Court of Common Pleas for the Fifth Judicial Circuit in the State of South Carolina entered an Order continuing trial against

---

[19]  The Debtors are not party to this stipulation.

Brenntag in the action styled *Kelly Payne Clark and Shannon Payne Clark, as Co-Executors of the Estate of Shelby Linville Payne v. 3M Company, et al.*, Case No. 2022-CP-40-01281 (the "**Payne Action**") to August 28, 2023.  Meghji Declaration, ¶ 20.  Brenntag settled the Successor Liability Claims in the Payne Action on or about August 11, 2023.  *Id.*

57.    The Debtors believe that the commencement, continuation, and settlement of Successor Liability Claims against the Protected Parties in the tort system would harm the Debtors' efforts in these Chapter 11 Cases.  Meghji Declaration, ¶ 21.  Permitting the Defendants to liquidate claims against the Debtors through prosecution or settlement of Successor Liability Claims outside of this Court would disrupt the Debtors' efforts to comprehensively resolve all Tort Claims, Successor Liability Claims, and Indemnification Claims in these Chapter 11 Cases.  *Id.*

58.    Moreover, without immediate injunctive relief, the Debtors will be compelled to pull key estate resources and personnel away from the Chapter 11 Cases and actively defend Successor Liability Claims against the Protected Parties, even as they attempt to resolve these very same claims in the Chapter 11 Cases.  Meghji Declaration, ¶ 22.

59.    In the absence of the relief requested by this Complaint, the Debtors believe that:

   A. Defendants who have asserted Successor Liability Claims against Brenntag have contended or will contend that the automatic stay applies only to the Debtors and will attempt to continue prosecuting such claims against Brenntag outside of the Chapter 11 Cases;

   B. Defendants who have sued only the Debtors will seek to amend their complaints to name one or more of the Protected Parties and prosecute Successor Liability Claims against those Protected Parties outside of the Chapter 11 Cases;

   C. Defendants who have pending motions to amend their complaints to add Successor Liability Claims will continue to pursue those amendments in an effort to proceed with litigation against the Protected Parties outside of the Chapter 11 Cases; and

   D. Defendants John and Jane Does 1-1,000 will commence Successor Liability Claims against the Protected Parties without naming the Debtors.

Meghji Declaration, ¶ 23.

## CAUSES OF ACTION

## COUNT I

### Declaratory relief pursuant to section 362 of the Bankruptcy Code

60.    The Debtors incorporate by reference paragraphs 1 through 59 as if fully set forth herein.

61.    Section 362(a)(3) of the Bankruptcy Code prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]"  11 U.S.C. § 362(a)(3).

62.    Section 541 of the Bankruptcy Code provides that the filing of a chapter 11 petition "creates an estate . . . comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a).

63.    Third Circuit precedent recognizes that claims (1) for which the debtor has standing to assert under applicable non-bankruptcy law and (2) that constitute "general claims" available to the debtor's other creditors are property of the debtor's bankruptcy estate.  *See In re Emoral, Inc.*, 740 F.3d 875, 879-82 (3d Cir. 2014) (applying New York and New Jersey law in holding that personal injury claimants' successor liability claims against transferee were property of the debtor's estate); *Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs.by Jamie, Inc.)*, 230 B.R. 36, 43 (Bankr. D.N.J. 1998) (holding that trustee succeeded to debtor's right to assert alter ego claim because corporate debtor's interest in its alter ego's assets is property of the estate).

64.    The Debtors have standing to pursue Successor Liability Claims under applicable non-bankruptcy law, whether the Court applies the substantive law of Delaware (which governs the 2004 Soco APA, 2004 WCD APA, and Brilliant APA), New York (the State where the 2004 Transactions closed), or New Jersey (the forum State for the Chapter 11 Cases and the State in

which WCD is incorporated).  *See*, *e.g. Emoral*, 740 F.3d at 881 (holding that successor liability claims against the transferee were property of the estate under the state law of both New York and New Jersey and were thus settled and released by bankruptcy trustee); *In re Tronox Inc.*, 855 F.3d 84, 104 (2d Cir. 2017) ("Under Delaware law, a trustee possesses standing to bring—and by logical extension, settle and release—an alter ego claim on behalf of a creditor of the debtor, as long as the claim qualifies as a 'general' claim.").

65.    Successor Liability Claims are "general claims" available to the Debtors' entire creditor body because both the successor and alter ego theories of recovery are "based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors."  *Emoral*, 740 F.3d at 881.

66.    Accordingly, and in line with Third Circuit precedent, Successor Liability Claims are automatically stayed under section 362(a)(3) of the Bankruptcy Code because any attempt by Defendants to commence, continue to prosecute, or settle such claims against one or more Protected Parties while the Chapter 11 Cases are pending constitutes an act to control property of the Debtors' estates.

**WHEREFORE**, the Debtors respectfully request that this Court: (a) after notice and a hearing, enter an order and judgment declaring that the commencement, continued prosecution, or settlement of Successor Liability Claims by Defendants against one or more Protected Parties while the Chapter 11 Cases remain pending violates the automatic stay imposed by section 362(a)(3) of the Bankruptcy Code; and (b) grant such other and further relief as the Court may deem proper.

## COUNT II

### Extension of the Automatic Stay to Successor Liability Claims to the Extent Such Claims are not Automatically Stayed Pursuant to Section 362(a)(3)

67.     The Debtors incorporate by reference paragraphs 1 through 66 as if fully set forth herein.

68.     Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]" 11 U.S.C. § 362(a)(1).

69.     Third Circuit precedent recognizes that the automatic stay imposed by section 362(a)(1) extends to enjoin actions against non-debtors in "unusual circumstances" such as where "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009); *see also McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 996 (4th Cir. 1986).

70.     There exists an identity of interest between the Debtors and the Protected Parties with respect to Successor Liability Claims such that the Court's extension of the automatic stay is warranted.  Successor Liability Claims are legally and factually predicated on the Debtors' property or operations prior to the sale of substantially all their operating assets in 2004 such that the Debtors are the *de facto* defendants in Successor Liability Claims.

71.     Indeed, Successor Liability Claims asserted against Brenntag to date involve the same products, time periods, alleged injuries, and evidence as Tort Claims against Debtors, and

fail to differentiate claims against Brenntag that are independent of its association with the Debtors (*i.e.*, claims alleging injury resulting from business operations conducted by Brenntag following the 2004 Transactions for which the Debtors do not owe indemnification obligations) from claims against Brenntag related to its association with the Debtors (*i.e.*, Successor Liability Claims for which the Debtors may owe indemnification obligations to Brenntag).

72.    As a result, litigating or attempting to establish the value of Successor Liability Claims would liquidate claims against the Debtors.  The prosecution of Successor Liability Claims would also trigger potential indemnification and similar obligations of the Debtors owed to the Protected Parties.  Because the Debtors are the real-party defendants in any suit seeking to liquidate and recover on account of Successor Liability Claims, section 362(a)(1) stays such actions.

73.    In addition, the commencement, continuation, or settlement of Successor Liability Claims by Defendants would have an adverse impact on the Debtors and the Chapter 11 Cases for similar reasons, including that any resolution of Successor Liability Claims could liquidate Indemnification Claims against the Debtors outside of the Chapter 11 Cases and subject the Debtors to the risk of *res judicata*, collateral estoppel, and record taint with respect to Tort Claims. Absent the relief sought herein, the Debtors would be compelled to defend their interests in Successor Liability Claims against the Protected Parties to prevent such harm to the estates, thereby defeating the "breathing spell" intended by the automatic stay.

74.    Moreover, the commencement, continuation, and piecemeal settlement of Successor Liability Claims would divert funds and resources to the Debtors' defense costs and reduce funds available for  a global resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims in these Chapter 11 Cases.  Permitting the Defendants to circumvent the

bankruptcy process in such a manner serves only to disrupt the Debtors' efforts to comprehensively resolve their liabilities in these Chapter 11 Cases.

75.     Accordingly, the "unusual circumstances" of these cases warrant the Court's extension of the automatic stay to Successor Liability Claims against the Protected Parties to the extent such claims are not automatically stayed as requested in Count I.

**WHEREFORE**, the Debtors respectfully request that this Court: (a) after notice and a hearing, enter an order and judgment extending the automatic stay to prohibit the commencement, continuation, or settlement of any action by Defendants seeking to hold the Protected Parties liable for Successor Liability Claims to the extent such claims are not automatically stayed as requested in Count I; and (b) granting such other and further relief as the Court may deem proper.

## COUNT III

### Preliminary Injunctive Relief, Pursuant to Sections 105 and 362 of the Bankruptcy Code

76.     The Debtors incorporate by reference paragraphs 1 through 75 as if fully set forth herein.

77.     Section 105(a) of the Bankruptcy Code authorizes and empowers this Court to issue any order that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Chapter 11 Cases, aid in the preservation of the assets of the Debtors' estates, and aid in the formulation and confirmation of a chapter 11 plan that maximizes recovery to all of the Debtors' creditors.

78.     Pursuant to sections 105(a) and 362 of the Bankruptcy Code, this Court may enjoin creditor actions against third parties to prevent an adverse impact on the Debtors' estates or to assure the orderly administration of these Chapter 11 Cases, including by fully effectuating the protections of the automatic stay.  An injunction is appropriate in this case to prohibit Defendants

from commencing, continuing or settling Successor Liability Claims while the Chapter 11 Cases are pending. Further, such an injunction is critical to the Debtors' ability to achieve the purposes for which it commenced the Chapter 11 Cases.

79.     In the Third Circuit, courts considering the propriety of an injunction under section 105(a) apply the traditional four-factor test for injunctions, as tailored to the unique circumstances of bankruptcy.  In bankruptcy, these four factors are: (i) the Debtors' reasonable likelihood of successful reorganization; (ii) the imminent risk of irreparable harm to the Debtors' estates in the absence of an injunction; (iii) the balance of harms between the Debtors and their creditors; and (iv) whether the public interest weighs in favor of an injunction.

80.     "In considering a request for an injunction, these four factors are not weighed simultaneously against one another.  Rather, the Court determines whether the first two threshold prongs are established, and if so, only then does it proceed to consider the third and fourth factors." *In re Philadelphia Newspapers*, LLC, 423 B.R. 98, 106 n.11 (E.D. Pa. 2010).

81.     The Debtors are likely to prevail on the merits of their request for an injunction under applicable Third Circuit law.  First, the Debtors' prospects for a successful outcome in the Chapter 11 Cases are strong.  The Debtors entered bankruptcy in good faith to permanently, fully, and equitably resolve the Tort Claims, Successor Liability Claims, and Indemnification Claims in one centralized forum.

82.     The Debtors have sufficient assets to fund these Chapter 11 Cases.  As set forth in the Debtors' *Schedules of Assets and Liabilities*, the Debtors had combined cash and cash equivalents of approximately $76 million as of the Petition Date.  The Debtors intend to use these funds, as well as any funds contributed by the Protected Parties as part of a comprehensive resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims, to fund

these Chapter 11 Cases, including through a plan that equitably and finally resolves the Debtors'
asbestos and environmental liabilities.

83.     Second, the failure to grant the requested injunction would irreparably harm the
Debtors and defeat the purpose of these Chapter 11 Cases.  Absent the requested injunction,
Defendants would be permitted to pursue Successor Liability Claims belonging to the Debtors'
estates, the value of which should be recovered for the benefit of all of the Debtors' creditors.

84.     Moreover, the resolution of Successor Liability Claims against certain Protected
Parties, whether through adverse judgment in the tort system or piecemeal settlement, may give
rise to Indemnification Claims against the Debtors.  Permitting Defendants to indirectly establish
claims against the Debtors through actions against third parties with potential indemnity rights
would undermine the purpose of these Chapter 11 Cases—to consolidate and collectively resolve
all current and future Tort Claims against the Debtors, as well as the Successor Liability Claims
and Indemnification Claims, through the bankruptcy process.  This non-bankruptcy litigation, if
not stayed, would undermine (or eliminate) the parties' and the Court's ability to achieve
confirmation of a plan that treats all creditors (including current and future Tort Claimants and
Indemnified Parties) fairly and equitably.

85.     Because Successor Liability Claims are legally and factually predicated on the
Debtors' operations prior to the closing of the 2004 Transactions, such claims necessarily require
an initial determination of the Debtors' asbestos and environmental liabilities.  An additional risk
of continued litigation of Successor Liability Claims is that the resolution of such claims could
bind the Debtors or impact their liability on Tort Claims under the doctrines of collateral estoppel
and *res judicata*.  Litigation of Successor Liability Claims also creates a substantial risk that Tort
Claimants will use statements, testimony and other evidence generated in those proceedings to try

to establish the Tort Claims against the Debtors.  To avoid these types of risks, the Debtors would be compelled to actively defend Successor Liability Claims in the tort system.  This would undermine the purpose of the automatic stay.

86.     Third, the balance of the harms weighs heavily in favor of the requested injunction because prosecution of Successor Liability Claims in the tort system would cause irreparable harm to the Debtors and their estates by liquidating claims against the Debtors and/or binding the Debtors with respect to rulings, judgments and evidentiary records established in those cases.  It would also compromise the protections of the automatic stay.  Failure to issue an injunction also may also prejudice certain Defendants by leading to different recoveries among similarly situated claimants depending on whether they recover through the tort system or a future, court-approved trust.

87.     On the other hand, the harm, if any, that an injunction might cause the Defendants is minimal, to the extent it would exist at all.  The issuance of an injunction will not permanently deprive the Defendants of an opportunity to pursue Successor Liability Claims.  Instead, it will merely halt those claims, giving the Debtors time to reach consensus on a comprehensive resolution of these Chapter 11 Cases.  Moreover, the Defendants would still be permitted to proceed against, and collect from, other alleged tortfeasors in the tort system on account of claims that do not constitute Successor Liability Claims.

88.     Fourth, the public interest weighs in favor of an injunction.  There is a strong public interest in a global resolution of Tort Claims against the Debtors, and injunctive relief is critical to the Debtors' efforts in that regard.  It also is in the public interest to promote fairness among similarly situated creditors and judicial economy within the court system.  This result is not possible if Defendants are permitted to circumvent the bankruptcy process through piecemeal

litigation of Successor Liability Claims in the tort system.  A successful outcome for the Chapter 11 Cases—and an injunction that makes such success possible—particularly serves the public interest by providing for a uniform and equitable resolution of the Debtors' liabilities.

89.     Accordingly, an injunction barring the commencement, continuation, and settlement of Successor Liability Claims while the Chapter 11 Cases are pending is appropriate and essential to the orderly and effective administration of the Debtors' estates.  Good cause exists for the entry of injunctive relief pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Bankruptcy Rule 7065.

**WHEREFORE**, the Debtors respectfully request that this Court: (a) after notice and a hearing, issue a preliminary injunction pursuant to sections 105 and 362 of the Bankruptcy Code prohibiting the filing, continued prosecution, and settlement of Successor Liability Claims while the Chapter 11 Cases are pending; and (b) grant such other and further relief as the Court may deem proper.

## COUNT IV

### Declaratory relief pursuant to section 541 of the Bankruptcy Code

90.     The Debtors incorporate by reference paragraphs 1 through 89 as if fully set forth herein.

91.     Successor Liability Claims are property of the applicable Debtor's estate for the reasons set forth in Count I above. Accordingly, the Debtors have sole standing to pursue Successor Liability Claims while the Chapter 11 Cases are pending.  *In re Wilton Armetale, Inc.*, 968 F.3d 273, 280 (3d Cir. 2020) ("[O]nce a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it.").

**WHEREFORE**, the Debtors respectfully request that this Court: (a) after notice and a hearing, enter an order and judgment declaring that Successor Liability Claims are property of the applicable Debtor's estate; and (b) grant such other and further relief as the Court may deem proper.

Dated: September 7, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

-and-

Seth Van Aalten, Esq. (*pro hac vice pending*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone:  (212) 752-8000
Email:      svanaalten@coleschotz.com
            adeleo@coleschotz.com

-and-

G. David Dean, Esq. (*pro hac vice* pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Email:      ddean@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

## <u>VERIFICATION</u>

I, Mohsin Y. Meghji, hereby certify:

I am the Chief Restructuring Officer of the Debtors and a Managing Partner of M3 Partners, LP ("**M3 Partners**"), the Debtors' restructuring advisor.  As Chief Restructuring Officer, I am generally familiar with the Debtors' historical businesses, financial condition, policies and procedures, claims management operations, books and records, and Chapter 11 Cases, as well as the Tort Claims asserted against the Debtors and Successor Liability Claims asserted against Brenntag.  I have read the Complaint[20] and certify that the factual allegations contained in the Complaint are true to the best of my knowledge, information, and belief.

I certify that the foregoing statements are true.  I am aware that if any statement made herein is willfully false, I am subject to punishment.

Dated: September 7, 2023                             */s/ Mohsin Meghji*_____
                                                     Mohsin Meghji
                                                     Chief Restructuring Officer
                                                     Brilliant National Services, Inc.

---

[20] Capitalized terms used but not defined in this Verification shall the meanings ascribed to such terms in the Complaint to which this Verification is attached.