**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al*., Debtors.[1] | Case No. 23-13575 (MBK) (Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC.,

Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000,

Defendants.

Adv. Proc. No. 23-01245 (MBK)

**DEBTORS' MOTION FOR (I) AN ORDER EXTENDING THE AUTOMATIC STAY TO AND/OR PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS PENDING ENTRY OF A FINAL, NON-APPEALABLE ORDER REGARDING THE DEBTORS' PROPOSED SETTLEMENT AND (II) A TEMPORARY RESTRAINING ORDER ENJOINING SUCH CLAIMS PENDING THE COURT'S DECISION ON THE DEBTORS' REQUEST FOR SUCH INJUNCTIVE RELIEF**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 2

JURISDICTION AND VENUE ............................................................................................. 7

FACTUAL BACKGROUND ................................................................................................ 7

RELIEF REQUESTED........................................................................................................ 17

BASIS FOR RELIEF .......................................................................................................... 17

  I.   The Court has Subject Matter Jurisdiction to Issue the Requested Stay/Injunction ......... 18

  II.  Extension of the Automatic Stay to the Brenntag Enjoined Claims is Warranted Under the Circumstances ............................................................................................................... 21

    A.    There is an Identity of Interest Between the Debtors and Brenntag with Respect to the Brenntag Enjoined Claims ................................................................................................ 22

    B.    The Continuation, Amendment, and Settlement of Brenntag Enjoined Claims Will Adversely Impact the Debtors ............................................................................................ 24

  III. The Court Should Exercise its Authority Under Section 105(a) of the Bankruptcy Code to Enjoin the Continuation, Amendment, and Settlement of Brenntag Enjoined Claims Pending a Resolution of the Settlement Motion ............................................................. 28

    A.    A Successful Outcome in the Chapter 11 Cases is Likely ......................................... 30

    B.    Failure to Enjoin the Brenntag Enjoined Claims Pending Resolution of the Settlement Motion Would Irreparably Harm the Debtors ..................................................................... 33

    C.    The Irreparable Harm that the Debtors Would Suffer in the Absence of an Injunction Substantially Outweighs Any Prejudice to Plaintiffs............................................................ 37

    D.    The Public Interest Favors the Requested Injunction ................................................. 40

  IV. The Court Should Approve the Procedures ....................................................................... 40

REQUEST FOR TEMPORARY RESTRAINING ORDER................................................... 43

NO BOND REQUIRED ....................................................................................................... 44

NOTICE.............................................................................................................................. 45

CONCLUSION.................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
    788 F.2d 994 (4th Cir. 1986) .........................................................................21, 27

*Acands, Inc. v. Travelers Cas. & Sur. Co.*,
    435 F.3d 252 (3d Cir. 2006).................................................................................20

*ADP, Inc. v. Levin*,
    No. 21-2187, 2022 WL 1184202 (3d Cir. Apr. 21, 2022) .......................................32

*In re Aldrich Pump LLC*,
    No. 20-03041 (JCW), 2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021).........31

*In re Am. Film Techs., Inc.*,
    175 B.R. 847 (Bankr. D. Del. 1994) .....................................................................24

*In re Bestwall LLC*,
    606 B.R. 243 (Bankr. W.D.N.C. 2019)........................................................ *passim*

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004), *as amended* (Feb. 23, 2005)...............................17, 18

*In re Denby-Peterson*,
    941 F.3d 115 (3d Cir. 2019)...................................................................................20

*In re Dow Corning I*,
    211 B.R. 545 (Bankr. E.D.M. 1997) .....................................................................38

*In re Excel Innovations*,
    502 F.3d 1086 (9th Cir. 2007) ..............................................................................29

*FPSDA II, LLC v. Larin (In re FPSDA I)*,
    No. 12-08032, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) ....................18

*In re G-I Holdings, Inc.*,
    420 B.R. 216 (D.N.J. 2009) ..................................................................................28

*In re Johns-Manville Corp.*,
    26 B.R. 420 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984) ...............24, 26, 38

*In re LTL Mgmt., LLC*,
    640 B.R. 322 (Bankr. D.N.J. 2022) ......................................................................32

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*,
   Case No. CV 21-20252 (FLW), 2022 WL 190673 (D.N.J. Jan. 21, 2022) ..................... *passim*

*McCartney v. Integra Nat. Bank N.*,
   106 F.3d 506 (3d Cir. 1997) ........................................................................................20, 21

*McHale v. Alvarez (In re The 1031 Tax Grp., LLC)*,
   397 B.R. 670 (Bankr.S.D.N.Y.2008) (Glenn, J.) ...................................................29

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979) ........................................................................................................23

*In re Philadelphia Newspapers, LLC*,
   407 B.R. 606 (E.D. Pa. 2009) ..............................................................21, 27, 28, 29

*In re Purdue Pharms., L.P.*,
   619 B.R. 38 (S.D.N.Y. 2020) .......................................................................................31

*In re Roggio*,
   612 B.R. 655 (Bankr. M.D. Pa. 2020) ....................................................................18

*In re Soundview Elite Ltd.*,
   543 B.R. 78 (Bankr. S.D.N.Y.) .................................................................................29

*Stoe v. Flaherty*,
   436 F.3d 209 (3d Cir. 2006), *as amended* (Mar. 17, 2006) ................................17

*In re Sudbury, Inc.*,
   140 B.R. 461 (Bankr. N.D. Ohio 1992) .............................................................24, 38

*The Lautenberg Foundation v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*,
   512 Fed. Appx. 18 (2d Cir.2013) ..............................................................................29

*In re Union Tr. Philadelphia, LLC*,
   460 B.R. 644 (E.D. Pa. 2011) ....................................................................................29

*In re United Health Care Org.*,
   210 B.R. 228 (S.D.N.Y. 1997) ...................................................................................37

*United States v. Whiting Pools, Inc.*,
   462 U.S. 198 (1983) ........................................................................................................38

*In re VistaCare Grp.*,
   LLC, 678 F.3d 218 (3d Cir. 2012) ............................................................................27

*In re W.R. Grace & Co.*,
   115 F. App'x 565 (3d Cir. 2004) ........................................................................26, 32

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) ...........................................................................................27

*In re W.R. Grace & Co.*,
591 F.3d 164 (3d Cir. 2009) ........................................................................................17

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
386 B.R. 17 (Bankr. D. Del. 2008) ................................................................ *passim*

**Statutes**

11 U.S.C. § 105(a) ........................................................................................... *passim*

11 U.S.C. § 362 .....................................................................................18, 20, 27

28 U.S.C. § 157 .................................................................................................6

28 U.S.C. § 1334 ...........................................................................................6, 17

28 U.S.C. § 1409 ...............................................................................................6

**Other Authorities**

Fed. R. Bankr. P. 7001 ......................................................................................6

Fed. R. Bankr. P. 7008 ......................................................................................6

Fed. R. Bankr. P. 7065 ......................................................................................6

Federal R. Civ. P. 65 .......................................................................................40

Local Rule 7065-1............................................................................................1, 6

S. Elizabeth Gibson, Judicial Management of Mass Tort Bankruptcy Cases,
Federal Judicial Center, at 1 (2005), available at
https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf .......................................30

TO THE HONORABLE MICHAEL B. KAPLAN,
CHIEF JUDGE, UNITED STATES BANKRUPTCY COURT:

Whittaker, Clark & Daniels, Inc. ("**WCD**") and its debtor affiliates (together with WCD, the "**Debtors**" or "**Plaintiffs**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") and plaintiffs in the above-captioned adversary proceeding (this "**Adversary Proceeding**"), by and through their undersigned counsel, hereby submit this motion (the "**Motion**"), pursuant to sections 105(a) and 362(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 7065-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**"), for entry of: (i) an Order, substantially in the form attached hereto as **Exhibit A** (the "**Preliminary Injunction Order**"), (a) extending the automatic stay to, and/or preliminarily enjoining the continuation, amendment, and settlement of, any Cause of Action against the Brenntag Releasees that is not a Debtor Released Estate Cause of Action and which (x) includes allegations of exposure to talc/asbestos prior to February 27, 2004 or (y) does not identify the year plaintiff was first allegedly exposed to talc/asbestos in the underlying complaint (such Cause of Action, a "**Brenntag Enjoined Claim**") pending this Court's entry of (1) a final, non-appealable Order granting the Settlement Motion or (2) an Order denying the Settlement Motion,[2] and (b) approving procedures pursuant to which (x) the Debtors may seek to amend the Schedule (as defined herein) to add Brenntag Enjoined Claims (the "**Schedule Amendment Procedures**") and (y) plaintiffs may seek to have their actions removed from the Schedule (the "**Schedule Removal Procedures**" and,

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1297] (the "**Settlement Motion**").

together with the Schedule Amendment Procedures, the "**Procedures**"); and (ii) a temporary restraining order, substantially in the form attached hereto as **Exhibit B** (the "**Temporary Restraining Order**"), enjoining the Brenntag Enjoined Claims pending the Court's decision on this Motion.[3]   In support of this Motion, the Debtors submit the *Declaration of Lathrop B. Nelson, III*, attached hereto as **Exhibit C** (the "**Declaration**"),[4] and respectfully state as follows:

### PRELIMINARY STATEMENT[5]

1.      The Debtors have worked tirelessly since the outset of these cases to achieve a value-maximizing, efficient, and equality-driven resolution for the benefit of all of their stakeholders.  Aided by the Court's recent Summary Judgment Opinion and Order, the Debtors were able to successfully complete negotiations of the Settlement Agreement, through which the Debtors propose to resolve all Estate Causes of Action, including Successor Liability Claims, for $535 million *plus* a release of any and all claims of the Contributing Parties against the Debtors, including potential indemnification claims.

2.      Prior to this monumental achievement, the Debtors sought a narrow and circumscribed TRO enjoining fewer than 75 actions against Brenntag that had impending trials or other dispositive hearings.  The purpose of this TRO was to preserve the status quo pending the Court's issuance of the Summary Judgment Order and to facilitate negotiations amongst the Debtors' key stakeholders on a path forward in these cases.  During this process, certain plaintiffs sought to circumvent the TRO by strategically dismissing the successor liability components of

---

[3] Contemporaneously with this Motion, the Debtors are filing an application to shorten time with respect to their request for entry of the Temporary Restraining Order, as well as the relief requested in the *Debtors' Motion for Leave to File an Amended Complaint* [Adv. Proc. Docket No. 298] (the "**Motion to Amend**").

[4] A chart identifying all known Brenntag Enjoined Claims that are currently pending is attached to the Declaration as Exhibit 1 (the "**Schedule**").

[5] Capitalized terms used in this Preliminary Statement but not defined herein shall have the meanings ascribed to such terms in this Motion.

their claims against Brenntag, in an effort to pursue direct claims against Brenntag that were nevertheless premised on allegations of pre-2004 talc/asbestos exposure and therefore implicated the Debtors' conduct, operations, and potential indemnification obligations to Brenntag. These efforts compelled the Debtors to seek this Court's intervention on multiple occasions to resolve the parties' disputes over the scope of the TRO.

3.    In its initial TRO Opinion, the Court explicitly recognized that "even direct claims against Brenntag can give rise to indemnification claims depending on the conduct alleged, the timeframes implicated, and the products involved" and therefore "direct claims against Brenntag are not categorically excepted from the relief sought by way of the Adversary Proceeding and the [TRO] Motion."[6] Accordingly, the Court's subsequent decisions addressing the scope of the TRO struck a balance among, on the one hand, the Debtors' interests in preserving the status quo pending the Court's determination of ownership of Successor Liability Claims and, with respect to claims against Brenntag that are not Successor Liability Claims, their interests in avoiding having to litigate Brenntag's potential indemnification rights in the tort system,[7] and, on the other hand, the plaintiffs' interests in prosecuting direct claims against Brenntag.

4.    To these ends, the Court permitted the plaintiff in the Haney Action to proceed to trial on direct claims against Brenntag on the basis that such action had no impact on these estates given the substantiated absence of any connection between plaintiff's alleged talc-related injuries and the Debtors' pre-2004 conduct and business operations. In contrast, the Court determined that the Lee, Cooper, and Sneider Actions fell within the scope of the TRO because the facts underlying

---

[6] TRO Opinion, at p. 9 n. 2.

[7] The Debtors dispute Brenntag's purported entitlement to indemnification with respect to claims that are not Successor Liability Claims and reserve all rights.

those claims implicated the Debtors' conduct in view of the allegations and evidence of plaintiffs'
pre-2004 talc/asbestos exposure.

5.      At the August 22, 2024 hearing on the Debtors' ninth request to extend the TRO,
the Court expressed its desire for the Debtors to present an "exit strategy" for these cases in
conjunction with any future requests for injunctive relief.   The Debtors have satisfied this
condition.   The Settlement Agreement, if approved on a final basis, would resolve all Successor
Liability Claims and other Estate Causes of Action, as well as any potential indemnification claims
of Brenntag, and provide substantial value to the Debtors' estates and creditors.   The Settlement
Agreement also provides for the construct of a confirmable chapter 11 plan as set forth in the Plan
Term Sheet, which the Contributing Parties have agreed to support.   Moreover, the Settlement
Agreement does not seek to impair, compromise, or release any direct claims against Brenntag that
could be asserted by plaintiffs.

6.      With a viable exit strategy for these cases now in place, an expanded injunction,
encompassing all claims against Brenntag premised on talc/asbestos exposure during time periods
that could implicate the Debtors' conduct and trigger potential indemnification claims against
them, is both reasonable and appropriate.   Although the Settlement Agreement is not conditioned
on the Court granting the injunctive relief sought herein, such relief will maintain the status quo
and preserve the value of the resolution proposed by the Settlement Agreement pending its
adjudication.   Accordingly, the Debtors file this Motion to preliminarily enjoin and/or extend the
automatic stay to the 684 Brenntag Enjoined Claims listed on the Schedule attached to the
Declaration as Exhibit 1, pending this Court's entry of (i) a final, non-appealable Order granting
the Settlement Motion or (ii) an Order denying the Settlement Motion.

7.      Significantly, 657 of the Brenntag Enjoined Claims (approximately 96%) are expressly pled as Successor Liability Claims and, therefore, are presently subject to the automatic stay pursuant to the Summary Judgment Order.  The stay and injunction requested herein is necessary, however, to prevent plaintiffs from attempting to circumvent the Summary Judgment Order through procedural machinations similar to those employed by the plaintiffs in the Lee, Cooper, and Sneider Actions, or some new variation thereof.

8.      The remaining 27 Brenntag Enjoined Claims are not pled as Successor Liability Claims, but either contain express allegations of pre-2004 talc/asbestos exposure in the underlying complaint or, in two instances, do not plead sufficient information for the Debtors to identify the year in which the respective plaintiffs were first allegedly exposed to talc/asbestos in order to reasonably assess their impact on these estates.  These Brenntag Enjoined Claims are substantially similar to the claims asserted against Brenntag in the Lee, Cooper, and Sneider Actions following those plaintiffs' dismissals of their Successor Liability Claims and should be enjoined for the same reasons the Court extended the TRO to those actions.

9.      For the avoidance of doubt, the Debtors are not aware of any Brenntag Enjoined Claim that asserts purely direct claims against Brenntag based solely on post-2004 talc/asbestos exposure, as was the case in the Haney Action which the Court declined to enjoin.  The Debtors encourage any affected plaintiff who believes that his or her claim against Brenntag constitutes a purely direct claim based solely on post-2004 talc/asbestos exposure to contact the Debtors' undersigned counsel in advance of the applicable objection deadlines.  The Debtors will work in good faith with such plaintiffs and Brenntag to informally resolve any dispute, if possible, and remove such action from the Schedule, as appropriate.  To that end, any party who wishes to

examine or copy the documents summarized in the Schedule can do so by contacting the Debtors'

undersigned counsel to obtain access to a data room containing such documents.

10.    A preliminary injunction and/or extension of the automatic stay of the Brenntag

Enjoined Claims will maximize the value of the resolution proposed by the Settlement Agreement.

Approval of the Settlement Agreement pursuant to a final, non-appealable Order would resolve all

Estate Causes of Action against the Contributing Parties, including Successor Liability Claims

against Brenntag, and would provide the Debtors with a release from any and all potential

indemnification claims that could be asserted by Brenntag.  As such, the Settlement Agreement, if

approved on a final basis, would provide a clear path for plaintiffs to pursue direct claims against

Brenntag in the future.

11.    In contrast, absent the stay extension and/or injunction requested herein, plaintiffs

would undoubtedly continue their efforts to circumvent the Summary Judgment Order in order to

prosecute direct claims against Brenntag notwithstanding any potential adverse impact on these

estates.  In that event, the Debtors would be compelled to participate in tort system litigation and

expend substantial resources defending their actions and Brenntag's potential indemnification

claims or suffer the consequences of adverse judgments and litigation prejudice of *res judicata*,

collateral estoppel, and record taint.  Importantly, whereas the automatic stay bars plaintiffs from

seeking to establish Brenntag's liability for injuries resulting from pre-2004 talc/asbestos exposure

(*i.e.*, Successor Liability Claims) following entry of the Summary Judgment Order, nothing would

prevent Brenntag from introducing evidence of such exposure at trial for the purpose of reducing

its liability apportionment (which a jury could then apportion to the Debtors) and/or asserting

potential indemnification claims against the Debtors in connection with litigation of direct claims

of plaintiffs that involve pre-2004 talc/asbestos exposure. The Debtors' request for a preliminary

injunction should be granted to prevent such harm to the Debtors' estates.

12.     The Debtors also seek entry of a Temporary Restraining Order on shortened notice

to enjoin the Brenntag Enjoined Claims until the Court renders its decision on the Debtors' request

for a preliminary injunction and/or extension of the automatic stay. The Debtors submit that such

interim relief is necessary to avoid intervening attempts by plaintiffs to plead around the Summary

Judgment Order in an effort to pursue direct claims against Brenntag that implicate the Debtors'

conduct, operations, and potential indemnification obligations to Brenntag.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this Adversary Proceeding and this

Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28

U.S.C. § 157(b)(2). Pursuant to Bankruptcy Rule 7008, the Debtors consent to the entry of final

orders or a final judgment by this Court in this Adversary Proceeding.

14.     Venue of this proceeding is proper in this District pursuant to 28 U.S.C. § 1409.

15.     The statutory predicates for the relief requested herein are sections 105(a) and

362(a) of the Bankruptcy Code, Bankruptcy Rules 7001(7) and 7065, and Local Rule 7065-1.

## FACTUAL BACKGROUND

### A.     The Adversary Proceeding and Summary Judgment Motion

16.     On September 7, 2023, the Debtors commenced this Adversary Proceeding by

filing a complaint [Adv. Proc. Docket No. 1] (the "**Complaint**") seeking: (i) a declaration that

Successor Liability Claims are property of the Debtors' estates, which the Debtors have sole

standing to pursue and compromise while the Chapter 11 Cases are pending; (ii) a declaration that

Successor Liability Claims, as property of the Debtors' estates, are automatically stayed; (iii) a

declaration that the stay extends to Successor Liability Claims against the Protected Parties to the

extent not automatically stayed; and (iv) a preliminary injunction enjoining the commencement, continuation, and settlement of Successor Liability Claims while these Chapter 11 Cases are pending.

17.    Contemporaneously with the filing of the Complaint, the Debtors filed: (i) a motion seeking to preliminarily enjoin the commencement, continuation and settlement of Successor Liability Claims while these Chapter 11 Cases remain pending [Adv. Proc. Docket No. 2] (the "**PI Motion**"); and (ii) a motion for summary judgment on Counts I, II, and IV of the Complaint [Adv. Proc. Docket No. 3] (the "**Summary Judgment Motion**").

18.    On October 12, 2023, the Court entered the *Case Management Order* [Adv. Proc. Docket No. 52] (the "**CMO**") in this Adversary Proceeding, pursuant to which the Court scheduled the hearing to consider the Summary Judgment Motion solely with respect to Counts I and IV of the Complaint (seeking a declaration that Successor Liability Claims are property of the Debtors' estates and thus subject to the automatic stay) for December 5, 2023 at 11:00 a.m. (ET).  CMO, ¶ 2.

19.    Pursuant to the CMO, the Court reserved judgment on the Summary Judgment Motion with respect to Counts I and IV to afford the parties time to engage in good faith settlement negotiations through mediation.  CMO, ¶¶ 6, 7.

20.    On November 15, 2023, the Court entered an Order appointing The Honorable Robert E. Gerber (Ret.) as mediator "to attempt to reach a comprehensive resolution of any and all issues, including, but not limited to, in conjunction with a potential section 524(g) plan, including: (a) environmental claims against the Debtors, including any contribution, indemnification, guarantee, subrogation claims, or other related claims; (b) claims related to personal injury in any way related to asbestos, talc, or other compounds or substances in connection with the Debtors'

historical business operations or products, including any contribution, indemnification, guarantee, subrogation claims, or other related claims; (c) successor liability or alter ego claims in connection with the Debtors' historical business operations or products; (d) the resolution of disputes over the obligations of certain insurers that issued insurance policies that cover or arguably cover the above claims; and (e) any other matters agreed to among the Mediation Parties or as otherwise directed by further order of the Court (collectively, the "**Mediation Matters**")."[8]  The Mediation Parties entered into three Court-approved stipulations extending mediation.[9]

21.     Ultimately, mediation did not result in a resolution of the Mediation Matters. Accordingly, on June 2, 2024, the Debtors filed a letter requesting that the Court issue its decision on the Summary Judgment Motion.[10]  On June 10, 2024, the Committee filed a responsive letter requesting that the Court terminate mediation and decline to render a decision on the Summary Judgment Motion.[11]  At a hearing held on June 17, 2024, the Court indicated its intent to rule on the Summary Judgment Motion and requested supplemental briefing from the parties.[12]  The Court declined the TCC's request to terminate mediation.[13]

22.     On August 13, 2024, following the completion of the requested supplemental briefing, the Court issued its decision on the Summary Judgment Motion [Adv. Proc. Docket No. 268] (the "**Summary Judgment Opinion**") holding that Successor Liability Claims are property of the Debtors' estates subject to the automatic stay provisions set forth in section 362(a) of the

---

[8] *See* Docket No. 654 at ¶ 5.

[9] The Mediation Parties included the Debtors, the Committee, the FCR, Brenntag, the Berkshire Entities, and DB US Holding Corp.  The mediation stipulations and orders approving same can be found at Docket Nos. 813, 814, 917, 922, 1057, 1059.

[10] *See* Adv. Proc. Docket No. 214.

[11] *See* Adv. Proc. Docket No. 216.

[12] Hearing Tr. 27:25-28:7 (Jun. 17, 2024).

[13] *Id.* at 29:13-20.

Bankruptcy Code.  The Court entered an order incorporating its Summary Judgment Opinion on

August 28, 2024 [Adv. Proc. Docket No. 292] (the "**Summary Judgment Order**").  Pursuant to

the CMO, and as a result of the Summary Judgment Order, the PI Motion filed with the Complaint

was withdrawn.

23.    The Summary Judgment Order does not address Counts II and III of the Complaint

(seeking to extend the automatic stay to, and preliminarily enjoin, the commencement,

continuation, and settlement of, Successor Liability Claims while these Chapter 11 Cases are

pending, respectively).  Accordingly, the Court scheduled a status conference for September 18,

2024 to discuss Counts II and III of the Complaint (the "**Status Conference**").

24.    Contemporaneously with the filing of this Motion, the Debtors filed the Motion to

Amend, pursuant to which the Debtors request this Court's leave to amend Counts II and III of the

Complaint to seek to extend the automatic stay to, and preliminarily enjoin, all Brenntag Enjoined

Claims pending the Court's entry of (a) a final, non-appealable Order granting the Settlement

Motion or (b) an Order denying the Settlement Motion, consistent with the relief requested herein.

**B.    The TRO**

25.    In light of the timeline for decision on the Summary Judgment Motion set forth in

the CMO, on October 31, 2023,  the Debtors filed a motion [Adv. Proc. Docket No. 61] (the "**TRO**

**Motion**") seeking a temporary restraining order to enjoin further prosecution of Successor

Liability Claims that had an impending trial or other dispositive hearing, coupled with procedures

to extend the TRO on a rolling basis every 28 days (the "**Extension Procedures**").

26.    The Court issued an opinion [Adv. Proc. Docket No. 88] (the "**TRO Opinion**") and

entered an Order [Adv. Proc. Docket No. 89] (the "**TRO**") granting the TRO Motion on November

22, 2023.[14]  The Court excluded the Haney Action[15] (discussed *infra*) from the TRO based on (i) Ms. Haney's counsel's representation that the claims asserted against Brenntag in the Haney Action were purely direct claims based solely on post-2004 exposure to talc/asbestos supplied by Brenntag and which had no connection to the Debtors, and (ii) Brenntag's confirmation of this representation.  Accordingly, the Court permitted the Haney Action to proceed against Brenntag only to the extent that Ms. Haney: (a) dismissed with prejudice all claims against Brenntag as successors in interest, alter egos, or other comparable capacities premised upon their alleged relationships to the Debtors; and (b) stipulated that no factual or legal issues relative to the Debtors' conduct would be adjudicated at trial.[16]

27.     Pursuant to the Extension Procedures approved in the TRO, the Debtors filed periodic requests to extend the TRO and amend the accompanying schedule to include additional actions asserting Successor Liability Claims against Brenntag with impending trials and other dispositive hearings, all of which the Court granted.[17]

28.     On April 15, 2024, the Debtors filed a motion to enforce the TRO [Adv. Proc. Docket No. 162] (the "**Motion to Enforce TRO**") against plaintiffs in the Lee Action[18] (discussed *infra*), who attempted to circumvent the TRO by dismissing Successor Liability Claims against Brenntag in order to proceed on their direct claims.

29.     On April 17, 2024, in connection with its response to the Motion to Enforce TRO, Brenntag filed its own motion [Adv. Proc. Docket No. 166] ("**Brenntag's TRO Motion**") seeking

---

[14] *See* Adv. Proc. Docket No. 89 (Order granting TRO Motion).

[15] *Haney v. Avon Products. Inc., et al.*, Case No. 23STCV06726 (Cal. Sup. Ct.)  (the "**Haney Action**").

[16] TRO at ¶ 1.

[17] To date, the Debtors have sought and obtained nine extensions of the TRO.  *See* Adv. Proc. Docket Nos. 112, 118, 121, 129, 133, 139, 147, 153, 157, 172, 190, 206, 210, 218, 226, 237, 250, 254, 288.

[18] *Lee v. Bi-Mart Corp., et al.*, Case No. 23CV40369 (Or. Cir. Ct.) (the "**Lee Action**").

to expand the TRO to cover all Successor Liability Claims, as well as any other claims that might give rise to potential indemnification claims against the Debtors, regardless of whether such claims were scheduled for trial or some other dispositive hearing in the near term.[19]

30.    The Debtors filed their reply in support of the Motion to Enforce TRO, which included a response to Brenntag's TRO Motion, on April 25, 2024.[20]  In that reply, the Debtors explained that they had intentionally sought a narrow and circumscribed TRO limited to actions against Brenntag that were approaching trial or some other dispositive hearing in an effort to balance the interests of Brenntag and the Tort Claimants while the parties engaged in mediation.[21]

31.    On April 26, 2024, the Court granted the Motion to Enforce TRO on grounds that an adverse judgment in the Lee Action could potentially trigger Brenntag's assertion of an indemnification claim against the Debtors – notwithstanding plaintiffs' purported dismissal of Successor Liability Claims – given the extensive allegations of pre-2004 talc exposure and the relationship between the Debtors and Brenntag set forth in the underlying complaint.[22]

32.    The Court denied Brenntag's request to expand the TRO at a hearing held on May 15, 2024, except in one respect.  The Court determined that Brenntag, as a non-debtor co-defendant, could not secure an expansion of the TRO without the support of an estate fiduciary arguing that such expansion is needed to protect the interests of the bankruptcy estate.[23]  However, the Court determined it was appropriate to modify the TRO to allow Brenntag to seek to settle any Successor Liability Claims asserted against it, subject to a 28-day notice period to the Debtors and

---

[19] Brenntag's Motion for Clarification, ¶ 49.

[20] *See* Adv. Proc. Docket No. 182.

[21] *See id.* at ¶ 1.

[22] *See* Adv. Proc. Docket No. 185; *see also* Hearing Tr. at 40:13-43:10 (Apr. 26, 2024).

[23] *See* Hearing Tr. at 44:23-45:20 (May 15, 2024).

the Committee, during which the parties could seek to expand the TRO to such claim.[24]  The Court

entered an Order so modifying the TRO on May 23, 2024.[25]

33.     The Debtors filed their ninth request to extend the TRO on July 31, 2024.[26]  On

August 12, 2024, the plaintiffs in the Cooper and Sneider Actions (discussed *infra*)[27] filed

objections to the Ninth TRO Request.  Cooper and Sneider argued that their actions were outside

the scope of the TRO because, prior to the TRO being extended to such actions, they dismissed all

Successor Liability Claims against Brenntag and stipulated not to introduce evidence regarding

the Debtors' conduct at trial.[28]

34.     The Court announced its decision regarding the Ninth TRO Request at a hearing

conducted on August 22, 2024.  The Court determined that, while the claims at issue in the Cooper

and Sneider Actions were not Successor Liability Claims (as such claims were previously

dismissed), the actions nonetheless fell within the scope of the TRO because plaintiffs' claims

against Brenntag could potentially impact the Debtors' bankruptcy estates given that discovery in

the actions adduced evidence of pre-2004 exposure to WCD talc products.[29]  In rendering its

decision, the Court emphasized that it would extend the TRO for a limited time and that the Debtors

would be expected to show the Court an "exit strategy" for these cases in order to obtain any

---

[24] *See id.* at 46:7-18.

[25] *See* Adv. Proc. Docket No. 208.

[26] *See* Adv. Proc. Docket No. 254 (the "**Ninth TRO Request**").

[27] *Cooper v. Arkema, Inc., et al.*, Case No. 23STCV15823 (Cal. Super. Ct.) (the "**Cooper Action**") and *Sneider v. Avon Products Inc., et al.*, Case No. 23STCV25951 (Cal. Super. Ct.) (the "**Sneider Action**").

[28] *See* Adv. Proc. Docket Nos. 266, 267 (the "**TRO Objections**").

[29] *See* Hearing Tr. 23:18-24 (Aug. 22, 2024).

further extension.[30]  Accordingly, the Court granted the Ninth TRO Request by Order dated August 26, 2024.[31]

### C.    The Settlement

35.    On September 3, 2024, the Debtors filed the Settlement Motion, through which the Debtors seek approval of a settlement agreement (the "**Settlement Agreement**")[32] by and among the Debtors, Brenntag, NICO, and DB US Holding Corp.[33]  The Settlement Agreement proposes to resolve all Estate Causes of Action against the Contributing Parties and their Related Parties (including Successor Liability Claims) as of the Effective Date of the Settlement Agreement, in exchange for a Settlement Payment of $535 million and a mutual release of all Causes of Action of the Contributing Parties against the Debtors, including, without limitation, potential indemnification claims of Brenntag.[34]

36.    The Settlement Agreement (i) provides for the release of any and all indemnification claims of Brenntag against the Debtors, and (ii) does *not* provide for the release

---

[30] *See id.* at 29:7-15.

[31] *See* Adv. Proc. Docket No. 288.

[32] A copy of the Settlement Agreement is attached as Exhibit 1 to the proposed order attached to the Settlement Motion as Exhibit A.

[33] "**Brenntag**" is defined in the Settlement Agreement to include: (i) Brenntag Canada, Inc., (ii) Brenntag Great Lakes, LLC; (iii) Brenntag Mid-South, Inc.; (iv) Brenntag North America, Inc.; (v) Brenntag Northeast, LLC; (vi) Brenntag Pacific, Inc.; (vii) Brenntag Southwest, Inc.; (viii) Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc. and as Mineral and Pigment Solutions, Inc.); and (ix) Coastal Chemical Co., LLC.

"**NICO**" is defined in the Settlement Agreement to include: (i) Berkshire Hathaway, Inc.; (ii) BH Columbia Inc.; (iii) Columbia Insurance Company; (iv) National Indemnity Company; (v) Resolute Management, Inc.; (vi) Ringwalt & Liesche Co.; and (vii) National Liability & Fire Insurance Company.

The Settlement Agreement defines Brenntag, NICO, and DB US Holding Corp. collectively as the "**Contributing Parties**".

[34] *See* Settlement Agreement, ¶¶ 2-3, 5-10.  The Settlement Agreement provides that up to $50 million of the Settlement Payment will be provided to the Debtors as part of a post-petition delayed draw term loan facility (the "**DIP Facility**") upon the Court's entry of an Order approving the DIP Facility.  The Debtors filed a motion seeking this Court's approval of the DIP Facility on September 3, 2024.  *See* Docket No. 1302.

of plaintiffs' direct claims against the Contributing Parties, including any direct claims against Brenntag for injuries arising from Brenntag's independent post-February 2004 operations.

37.     The Settlement Agreement also provides for the construct of a confirmable chapter 11 plan in these cases, as memorialized in the Plan Term Sheet attached to the Settlement Agreement as Exhibit B (the "**Plan Term Sheet**"), which the Contributing Parties have agreed to support.

**D.     The Brenntag Enjoined Claims and the Need for the Relief Requested Herein**

38.     The Brenntag Enjoined Claims sought to be stayed and/or enjoined pursuant to this Motion consist of all Causes of Action against the Brenntag Releasees (*i.e.*, Brenntag and its Related Parties) that are not Debtor Released Estate Causes of Action, and which (i) include allegations of exposure to talc/asbestos prior to February 27, 2004 (*i.e.*, the closing date for the sale of substantially all of the Debtors' operating assets to Brenntag) or (ii) do not identify the year plaintiff was first allegedly exposed to talc/asbestos in the underlying complaint.  In other words, a Brenntag Enjoined Claim is a talc/asbestos claim that seeks to establish Brenntag's direct liability for injuries resulting from Brenntag's independent conduct post-2004—and which therefore is not subject to the automatic stay pursuant to the Summary Judgment Order—but which also contains allegations of pre-2004 talc/asbestos exposure and therefore implicates the Debtors' conduct, operations, and potential indemnification obligations to Brenntag, or which does not provide sufficient information in the underlying complaint for the Debtors to identify the year in which plaintiff was first allegedly exposed to talc/asbestos and therefore make a reasonable determination as to the impact on these estates.

39.     The Schedule identifying all known Brenntag Enjoined Claims that are currently pending is attached to the Declaration as Exhibit 1.  In addition to providing basic identifying

information for each subject talc/asbestos action, the Schedule also provides the following

information for each such action: (i) whether Brenntag was identified as a successor to one or more

Debtors in the underlying complaint (from which it may be reasonably inferred that the claim

includes allegations of pre-2004 talc/asbestos exposure); (ii) whether the underlying complaint

contains express allegations of plaintiff's pre-2004 talc/asbestos exposure, as well as a citation to

such allegations in the underlying complaint; (iii) the year of plaintiff's initial alleged talc/asbestos

exposure or an indication that the year of plaintiff's initial alleged exposure cannot be determined

from the face of the underlying complaint; and (iv) whether the plaintiff and Brenntag entered into

a stipulation to bifurcate claims against the Debtors from claims against Brenntag (from which it

also may be reasonably inferred that the claim includes allegations of pre-2004 talc/asbestos

exposure).

40.    The Debtors submit that the Schedule contains more than sufficient evidence

demonstrating that each Brenntag Enjoined Claim is properly within the scope of the

stay/injunction requested herein.  The Debtors intend to admit the Schedule into the record of this

Motion as a summary of voluminous documents under Rule 1006 of the Federal Rules of Evidence.

Any party who wishes to examine or copy the documents summarized in the Schedule can do so

by contacting the Debtors' undersigned counsel to obtain access to a data room containing such

documents.

41.    Notably, approximately 657 of the 684 actions listed on the Schedule (*i.e.* 96% of

such actions) are expressly pled as Successor Liability Claims against Brenntag.  Plaintiffs in the

remaining 27 actions listed on the Schedule expressly allege talc/asbestos exposure prior to 2004

in their complaints or, in two cases, the underlying complaint does not allege sufficient information

for the Debtors to determine plaintiffs' exposure timeline.  The Debtors are not aware of any

Brenntag Enjoined Claim listed on the Schedule that consists solely of direct claims against Brenntag for its independent conduct post-2004 (as was the case in the Haney Action the Court excluded from the TRO).

42.     The Debtors file this Motion seeking to extend the automatic stay to and/or enjoin the continuation, amendment, or settlement of the Brenntag Enjoined Claims pending this Court's entry of (a) a final, non-appealable Order granting the Settlement Motion or (b) an Order denying the Settlement Motion, as well as to obtain a Temporary Restraining Order enjoining such claims pending the Court's decision.  For the reasons set forth herein, the injunctive relief sought by this Motion is necessary to maintain the status quo while the Court considers the Settlement Agreement, final approval of which would clear a path for plaintiffs to proceed against Brenntag on direct claims relating solely to their post-2004 talc/asbestos exposure without subjecting the Debtors to the significant risks discussed herein.

## **RELIEF REQUESTED**

43.     By this Motion, the Debtors seek entry of: (i) the Preliminary Injunction Order (a) extending the automatic stay to, and/or enjoining the continuation, amendment, or settlement of, all Brenntag Enjoined Claims pending the entry of (x) a final, non-appealable Order granting the Settlement Motion or (y) an Order denying the Settlement Motion and (b) approving the Procedures; and (ii) the Temporary Restraining Order enjoining such claims pending the Court's decision.

## **BASIS FOR RELIEF**

44.     In *In re LTL Management, LLC*, this Court concluded "that [section] 362(a), [section] 105(a), or a court's inherent powers can each serve as independent bases for extension of a stay or injunction to nondebtor third parties." 638 B.R. 291, 300 (Bankr. D.N.J. 2022).  However, because certain courts in this Circuit still view the source of authority for such relief as an open-

ended question, the Court adopted the following three-prong test to determine whether such relief

was appropriate: (i) whether the Court has jurisdiction to issue the injunction; (ii) whether

extension of the automatic stay under § 362(a) to the non-debtors is appropriate; and (iii) whether

the Court should, in its discretion, issue the injunction. *See id.* at 301 (citing *In re Philadelphia*

*Newspapers, LLC*, 407 B.R. 606, 611 (E.D. Pa. 2009)).  The Debtors satisfy each prong of this

test.

45.     Accordingly, for the reasons set forth herein, the Court should enter an order

extending the automatic stay to, and/or enjoining the continuation, amendment, and settlement of,

Brenntag Enjoined Claims pending this Court's entry of (a) a final, non-appealable Order granting

the Settlement Motion or (b) an Order denying the Settlement Motion.

## I.      The Court has Subject Matter Jurisdiction to Issue the Requested Stay/Injunction

46.     Section 1334 of title 28 of the U.S. Code provides that the Bankruptcy Court has

subject matter jurisdiction over the following matters: (i) cases under title 11; (ii) proceedings

arising under title 11; (iii) proceedings arising in a case under title 11; and (iv) proceedings related

to a case under title 11.  *See* 28 U.S.C. § 1334(b); *see also In re Combustion Eng'g, Inc.*, 391 F.3d

190, 225 (3d Cir. 2004), *as amended* (Feb. 23, 2005).  "The category of cases 'under' title 11

'refers merely to the bankruptcy petition itself.'"  *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir.

2006), *as amended* (Mar. 17, 2006) (citation omitted).  "A case 'arises under' title 11 'if it invokes

a substantive right provided by title 11.'"  *Id.*  "Proceedings 'arise in' a bankruptcy case, 'if they

have no existence outside of the bankruptcy.'"  *Id.*  "Finally, a proceeding is 'related to' a

bankruptcy case if 'the outcome of that proceeding could conceivably have any effect on the estate

being administered in bankruptcy.'"  *Id.* (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d

Cir.1984)).  When a jurisdictional issue is before a court, "[w]hat will or will not be sufficiently

related to a bankruptcy to warrant the exercise of subject matter jurisdiction is a matter than must

be developed on a fact-specific, case-by-case basis." *In re W.R. Grace & Co.*, 591 F.3d 164, 174 n. 9 (3d Cir. 2009).

47.    "Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as 'core' proceedings; whereas proceedings 'related to' a case under title 11 are referred to as 'non-core' proceedings." *Combustion Eng'g, Inc.*, 391 F.3d at 225. "A bankruptcy court has the power to hear, decide and enter final orders and judgments in" core proceedings, but does not have the same authority in non-core proceedings. *In re Roggio*, 612 B.R. 655, 659-60 (Bankr. M.D. Pa. 2020) (citing *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999)).

48.    The Third Circuit has not addressed whether a request for an injunction qualifies as a core proceeding. However, in *LTL Management*, the district court held that such a proceeding is core because the request for relief is rooted in sections 105 and 362 of the Bankruptcy Code. *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, Case No. CV 21-20252 (FLW), 2022 WL 190673, at *4 (D.N.J. Jan. 21, 2022). Other courts have reached the same conclusion. *See, e.g., FPSDA II, LLC v. Larin (In re FPSDA I)*, No. 12-08032, 2012 WL 6681794, at *1, *5 (Bankr. E.D.N.Y. Dec. 21, 2012) (finding "arising under" jurisdiction over motion to extend a section 362 automatic stay and issue a section 105 injunction covering claims against non-debtor third parties, which therefore qualified as a "core" proceeding). Thus, this Court has "core" subject matter jurisdiction to issue the injunction and stay requested in this Motion and Adversary Proceeding.

49.    Alternatively, even if it were determined that the instant proceeding is not "core," the Court nonetheless has "related to" jurisdiction over the Brenntag Enjoined Claims at issue in this proceeding such that it may issue the requested injunction and stay. As noted above, a

proceeding is "related to" a bankruptcy case if it has a "conceivable effect" on the debtor's estate. In other words, "an action is 'related to' bankruptcy 'if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *In re Broad Street Media LLC*, Adv. Pro. No. 17-1450 (JNP), 2017 WL 5624879, at *4 (Bankr. D. N.J. Nov. 20, 2017) (quoting *Pacor*, 743 F.2d at 994) (emphasis omitted).

50.    Here, the continued prosecution, amendment, or settlement of Brenntag Enjoined Claims in the tort system prior to a final ruling on the Settlement Motion would negatively impact the Debtors' estates because the Brenntag Enjoined Claims either include allegations of a claimant's pre-2004 talc/asbestos exposure or do not provide sufficient information in the underlying complaint for the Debtors to identify the year in which plaintiff was first allegedly exposed to talc/asbestos.  As a result, such claims implicate the Debtors' operations prior to the sale of substantially all of their operating assets to Brenntag, or do not plead sufficient facts for the Debtors to reasonably assess their impact on these estates, and therefore could result in potential liability against the Debtors through the assertion of indemnification claims or liability apportionment in the tort system.[35]

51.    Importantly, this remains true even in the event that a plaintiff decides to withdraw allegations of pre-2004 talc/asbestos exposure or otherwise stipulates not to introduce evidence of such exposure at trial.  That is because nothing prohibits Brenntag from introducing at trial evidence of the Debtors' conduct and plaintiff's pre-2004 talc/asbestos exposure for the purpose of reducing its liability apportionment and/or asserting potential indemnification claims against the Debtors.

---

[35] *See* Hearing Tr. at 25:7-12 (Aug. 22, 2024).

52.     Accordingly, the Court plainly has subject matter jurisdiction to issue the stay/injunction sought by this Motion.

## II.     Extension of the Automatic Stay to the Brenntag Enjoined Claims is Warranted Under the Circumstances

53.     Section 362(a) of the Bankruptcy Code provides for an automatic stay of, among other things, the commencement or continuation of a proceeding against the debtor that was or could have been commenced prepetition, or to recover a claim against the debtor that arose prepetition, as well as any act to obtain possession of or control over property of the debtor's estate. *See* 11 U.S.C. § 362(a)(1), (3).  The Third Circuit has held that the purpose of the automatic stay is:

> (1) to protect the debtor, by stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a respite from creditors and a chance 'to attempt a repayment or reorganization plan or simply be relieved of the financial pressures that drove him [or her] into bankruptcy;' and (2) to protect 'creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors.'

*In re Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019) (citations omitted); *see also McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 511 (3d Cir. 1997) (one purpose of section 362 is "to centralize all prebankruptcy civil claims against a debtor in the bankruptcy court.").

54.     "Although the scope of the automatic stay is broad, its protections typically apply only to debtors, not nondebtor defendants."  *See LTL Mgmt., LLC*, 638 B.R. at 299; *see also Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006) ("The scope of the automatic stay is broad and covers all proceedings against a debtor, including arbitration.").

55.     Nonetheless, bankruptcy courts have entered orders extending the automatic stay to non-debtors in "unusual circumstances" such as where "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or

(ii) the third-party action will have an adverse impact on the debtor's ability to accomplish

reorganization." *Philadelphia Newspapers*, 407 B.R. at 616; *see also McCartney*, 106 F.3d at 510-

11; *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986).

56.     Each of these "unusual circumstances" is present here.   An identity of interest

between the Debtors and Brenntag exists with respect to the Brenntag Enjoined Claims given that

such claims either involve allegations of a claimant's pre-2004 talc/asbestos exposure and

therefore implicate the Debtors' conduct prior to the sale of substantially all of their operating

assets to Brenntag or do not plead sufficient facts for the Debtors to reasonably assess their impact

on these estates.   These "unusual circumstances" are described more fully below.

**A.     There is an Identity of Interest Between the Debtors and Brenntag with Respect to the Brenntag Enjoined Claims**

57.     An identity of interest "arises when there is such identity between the debtor and

the third-party defendant that the debtor may be said to be the real party defendant and that a

judgment against the third-party defendant will in effect be a judgment or finding against the

debtor." *Robins*, 788 F.2d at 999; *accord McCartney*, 106 F.3d at 510-11 (concluding that the

automatic stay extended to enjoin an action against a non-debtor third party where the debtor "was,

in essence, the real party in interest" in the pursuit of a deficiency judgment against the third party).

58.     In *LTL Management*, this Court held that there was an identity of interest between

the debtor in that case and the non-debtor co-defendants such that the talc claims sought to be

stayed were effectively suits against the debtor because "the talc claims against the Protected

Parties involve the same products, same time periods, same alleged injuries, and same evidence as

claims against Debtor."   638 B.R. at 306; *see also W.R. Grace & Co. v. Chakarian (In re W.R.*

*Grace & Co.)*, 386 B.R. 17, 36 (Bankr. D. Del. 2008) (finding an identity of interest between a

debtor and a non-debtor where the debtor's conduct or product was "at the core of the issues raised" in actions against the non-debtor).

59.     Here, the Brenntag Enjoined Claims either involve allegations of a claimant's pre-2004 talc/asbestos exposure and therefore implicate the Debtors' conduct prior to the sale of substantially all of their operating assets to Brenntag or do not plead sufficient facts for the Debtors to reasonably assess their impact on these estates.  As such, the adjudication of these claims prior to a final order on the Settlement Motion could implicate the Debtors' own tort liabilities and would compel the Debtors to participate in tort system litigation and expend scarce estate resources (including proceeds of the DIP Facility, if approved) to defend themselves against claims which may be fully and finally resolved under the Settlement Agreement.[36]

60.     The Debtors' potential indemnification obligations also give rise to an identity of interest with Brenntag.  Importantly, the indemnification claims need not be "absolute" but, as this Court explained in *LTL Management*, "the mere possibility of indemnification obligations warrants extension of the automatic stay."  638 B.R. at 312-13.  Absent final approval of the Settlement Agreement, and the resulting release of potential indemnification claims by Brenntag, any adverse judgment or settlement of the Brenntag Enjoined Claims could potentially trigger the Debtors' indemnification obligations to Brenntag and give rise to claims against the Debtors in these cases.

61.     Accordingly, there is an identity of interest between the Debtors and Brenntag with respect to the Brenntag Enjoined Claims.

---

[36] *See* Hearing Tr. 25:21-26:3 (Aug. 22, 2024).

**B.    The Continuation, Amendment, and Settlement of Brenntag Enjoined Claims Will Adversely Impact the Debtors**

62.    "[A] critical factor in deciding whether to extend the stay is the potential adverse impact on a debtor's estate[.]" *LTL Mgmt.*, 638 B.R. at 306.  In *LTL Management*, this Court held that "continued litigation against the Protected Parties would liquidate pending tort claims, as well as indemnification claims, against Debtor outside of chapter 11 . . . frustrating the purpose of the automatic stay." *Id.* at 307.

63.    Similarly, many of the same facts that give rise to an identity of interest between the Debtors and Brenntag demonstrate the adverse impact on the Debtors' estates posed by the continuation, amendment, and settlement of Brenntag Enjoined Claims.  For instance, any adverse judgment or settlement of direct claims against Brenntag that potentially implicate the Debtors' conduct, operations, and potential indemnification obligations to Brenntag may give rise to the assertion of potential indemnification claims against the Debtors.

64.    Moreover, the continued prosecution of Brenntag Enjoined Claims would distract the Debtors and Brenntag from their efforts to obtain this Court's approval of the Settlement Agreement, which agreement is a key component of the Debtors' exit strategy in these cases. Continued prosecution of Brenntag Enjoined Claims would also force the Debtors to defend themselves in the tort system, thereby diminishing funds available to plaintiffs through the Settlement Agreement, against potential claims and obligations that would be fully and finally resolved by the Settlement Agreement.  *Cf. LTL Mgmt.*, 638 B.R. at 307.

65.    In the event the Debtors were to decide not to participate in tort system litigation of the Brenntag Enjoined Claims, the Debtors would face significant risk that findings of fact with respect to a claimant's pre-2004 talc/asbestos exposure could bind the Debtors or result in the Debtors' own tort liability under the doctrines of collateral estoppel and *res judicata*.  This risk is

underscored by the fact that collateral estoppel has been applied offensively by litigants who were not parties to the prior litigation. *See, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (allowing offensive use of collateral estoppel to prevent a corporation from defending against the stockholder class action of plaintiffs who were not parties to prior SEC litigation against the corporation).

66.     Courts have consistently concluded that the risks of collateral estoppel and *res judicata* warrant a stay of third-party litigation that thwarts the purposes of the automatic stay. *See, e.g., LTL Mgmt.*, 638 B.R. at 313-17 ("Debtor contends that permitting continued litigation against the Protected Parties 'creates risks of binding the Debtor through res judicata and collateral estoppel, and creating an evidentiary record that prejudices the Debtor.' The Court agrees."); *see also In re Bestwall LLC*, 606 B.R. 243, 256 (Bankr. W.D.N.C. 2019), *aff'd*, No. 3:20-CV-103-RJC, 2022 WL 67469 (W.D.N.C. Jan. 6, 2022), *aff'd*, 71 F.4th 168 (4th Cir. 2023), *aff'd*, No. 3:20-CV-105-RJC, 2022 WL 68763 (W.D.N.C. Jan. 6, 2022), *and aff'd*, 71 F.4th 168 (4th Cir. 2023) (determining that the risks posed by the doctrines of *res judicata* and collateral estoppel, among other factors, warrant a preliminary injunction of litigation against non-debtor affiliates) (subsequent history omitted); *In re Sudbury, Inc.*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); *In re Johns-Manville Corp.*, 26 B.R. 420, 435-37 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984), and *vacated on other grounds*, 41 B.R. 926 (S.D.N.Y. 1984) (concluding that the risk of collateral estoppel would irreparably injure the estate and, thus, issuance of a stay of claims against non-debtors was warranted); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 850-55 (Bankr. D. Del. 1994) (staying claims against debtor's directors and holding that

a potential finding of liability against such directors would be based on acts undertaken by directors as agents of the debtor and therefore would expose the debtor to the risk of being collaterally estopped from denying liability for the directors' actions).

67.     While plaintiffs are barred by the automatic stay from pursuing Brenntag for pre-2004 talc/asbestos exposure (*i.e.*, Successor Liability Claims), absent the stay/injunction requested herein, there is nothing to prevent plaintiffs from amending their complaints to abandon the successor liability portions of their claims in order to pursue direct claims against Brenntag that nevertheless include allegations of pre-2004 talc/asbestos exposure and thereby implicate the Debtors' conduct, operations, and potential indemnification obligations, or which are not pled with sufficient detail for the Debtors to rule out pre-2004 exposure and the concomitant risk to these estates.  Likewise, there is nothing to prevent Brenntag from introducing evidence of plaintiffs' pre-2004 talc/asbestos exposure at trial for the purpose of reducing its own liability apportionment (which a jury could then apportion to the Debtors) or establishing potential indemnification claims against the Debtors.

68.     Accordingly, any rulings or findings regarding Brenntag Enjoined Claims may bind the Debtors or impact their liability.  Under these circumstances, the Debtors would be compelled to expend scarce estate resources defending such actions, even as they work to obtain approval of the Settlement Agreement which provides for Brenntag's release of any and all claims against the Debtors, including any potential indemnification claims.  This result would undermine the intended purpose of the automatic stay.

69.     Beyond the potential consequences of collateral estoppel and *res judicata*, litigation of Brenntag Enjoined Claims would allow parties to use statements, testimony and other evidence generated in those proceedings with respect to a claimant's pre-2004 talc/asbestos exposure to

establish the factual predicate for the Debtors' tort liabilities.  The burden of protecting against evidentiary prejudice was part of the justification for extending the automatic stay in *LTL Management*.  *See* 638 B.R. at 317 ("As stated previously, the risk that litigation against the Protected Parties could result in adverse consequences for Debtor-such as record taint-weighs in favor of extending the automatic stay.").

70.     In support of this conclusion, the Court cited favorably to a number of Third Circuit decisions and bankruptcy cases within the Third Circuit.  *See, e.g.*, *In re W.R. Grace & Co.*, 115 F. App'x 565, 569 n.4 (3d Cir. 2004) (citing *In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984) and acknowledging a risk that the evidentiary record created in a case against a nondebtor could later be used in a case against the debtor); *Healthcor Offshore Master Fund, L.P. v. Mallinckrodt plc (In re Mallinckrodt PLC)*, Adv. Pro. No. 20-50850-JTD, 2021 WL 5275781, at *2 (D. Del. Nov. 10, 2021) (denying leave to file interlocutory appeal of order extending preliminary injunction because bankruptcy court appropriately performed "unusual circumstances" test and held that continued proceedings created "significant risk" of, among other thing, record taint); *W.R. Grace & Co.*, 386 B.R. at 35 ("Under this 'broader view of the potential impact on the debtor,' this court takes into account the risks of collateral estoppel and record taint.").

71.     Based on the foregoing, an extension of the automatic stay to prohibit the continuation, amendment, and settlement of Brenntag Enjoined Claims pending the Court's entry of (a) a final, non-appealable Order granting the Settlement Motion or (b) an Order denying the Settlement Motion, is warranted under the unusual circumstances present in these Chapter 11 Cases.

III.    **The Court Should Exercise its Authority Under Section 105(a) of the Bankruptcy Code to Enjoin the Continuation, Amendment, and Settlement of Brenntag Enjoined Claims Pending a Resolution of the Settlement Motion**

72.    Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). This includes "ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process" of a bankruptcy case. *Johns-Manville*, 26 B.R. at 425 (citing 2 COLLIER ON BANKRUPTCY § 362.05 (15th Ed.)).

73.    Under section 105(a), courts have broad authority "to enjoin parties other than the bankrupt from commencing or continuing litigation." *Robins*, 788 F.2d at 1002 (quoting *In re Otero Mills, Inc.*, 25 B.R. 1018, 1020 (D.N.M. 1982)); *see also In re VistaCare Grp.*, LLC, 678 F.3d 218, 231 n.11 (3d Cir. 2012) ("Bankruptcy courts have broad powers (in addition to 11 U.S.C. § 362) to protect the property of the estate. For example, under 11 U.S.C. § 105(a), a bankruptcy court may issue injunctive relief."). An injunction as to third-party litigation is appropriate where, among other things, the third-party litigation is likely to negatively impact a successful outcome in the debtor's bankruptcy proceeding. *See W.R. Grace*, 386 B.R. at 30; *Philadelphia Newspapers*, 407 B.R. at 616-17. In such cases, an injunction allows the debtor to receive the benefits of the automatic stay imposed by section 362 of the Bankruptcy Code, which aims to:

> protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan[.]

*Robins*, 788 F.2d at 998; *see also In re W.R. Grace & Co.*, 475 B.R. 34, 147 (D. Del. 2012) (quoting *Robins*).

74.     Acting under the broad authority granted by section 105(a), courts have consistently enjoined claims against non-debtor entities, both in mass tort and non-mass tort bankruptcies, to maintain the integrity of the debtor's estate and fully effectuate the protections of the automatic stay.  *See Bestwall*, 606 B.R. at 254 ("Injunctions of the type requested by the Debtor have previously and uniformly been issued in numerous [] asbestos-related cases[.]"); *W.R. Grace & Co.*, 386 B.R. at 34 (enjoining actions against a third-party railroad that transported the debtor's asbestos-containing products).

75.     Courts considering the propriety of an injunction under section 105(a) typically apply the traditional four-pronged test for injunctions, as modified for the bankruptcy context.  *See In re G-I Holdings, Inc.*, 420 B.R. 216, 281 (D.N.J. 2009); *Philadelphia Newspapers*, 407 B.R. at 616–17 (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)). The four elements, as tailored to a bankruptcy case, are: (i) the debtor's reasonable likelihood of a successful reorganization; (ii) the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; (iii) the balance of harms between the debtor and its creditors; and (iv) whether the public interest weighs in favor of an injunction.  *G-I Holdings*, 420 B.R. at 281; *see also Bestwall*, 606 B.R. at 253.

76.     "In considering a request for an injunction, these four factors are not weighed simultaneously against one another. Rather, the Court determines whether the first two threshold prongs are established, and if so, only then does it proceed to consider the third and fourth factors." *Philadelphia Newspapers*, 423 B.R. at 106 n.11 (citing *Tenafly*, 309 F.3d at 157).

77.     Here, as set forth below, the Debtors have satisfied the threshold showing because the Debtors' prospects of obtaining approval of the Settlement Agreement, which in turn provides a source of substantial funding for creditor distributions, are strong. In addition, as set forth below,

the balance of the harms and consideration of public interests both weigh in favor of the requested relief.

### A.    A Successful Outcome in the Chapter 11 Cases is Likely

78.    "In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize." *In re Union Tr. Philadelphia, LLC,* 460 B.R. 644, 660 (E.D. Pa. 2011) (quoting *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986)). Courts have held that, in this context, a "successful reorganization" includes the confirmation of a plan of liquidation. *In re Soundview Elite Ltd.*, 543 B.R. 78, 119 (Bankr. S.D.N.Y.) ("Although any reorganization plan the Trustee might propose would almost certainly be a liquidating plan, that does not foreclose this Court from finding the requisite likelihood of success."); *Myerson & Kuhn v. Brunscwock Assocs. Ltd. P'Ship (In re Myerson & Kuhn)*, 121 B.R. 145, 154 (Bankr. S.D.N.Y 1990) ("Section 105 grants bankruptcy courts ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process, whether in a liquidation or in a reorganization case.") (citations omitted); *see also The Lautenberg Foundation v. Picard (In re Bernard L. Madoff Inv. Sec., LLC),* 512 Fed. Appx. 18, 20 (2d Cir.2013) (granting preliminary injunction under section 105(a) in liquidation under Securities Investor Protection Act); *McHale v. Alvarez (In re The 1031 Tax Grp., LLC),* 397 B.R. 670, 686 (Bankr.S.D.N.Y.2008) (issuing preliminary injunction under section 105(a) to aid chapter 11 process even though chapter 11 trustee was pursuing chapter 11 liquidation plan).

79.    "[T]o demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed, and need not prove same with certainty." *LTL Mgmt.*, 638 B.R. at 320; *see also Bestwall*, 606 B.R. at 254-55; *In re Excel Innovations*, 502 F.3d 1086, 1097 (9th Cir. 2007) ("[I]t is not a high burden to show a reasonable likelihood of success");

*see also Philadelphia Newspapers*, 407 B.R. at 617 (noting the speculative nature of the inquiry into the likelihood of success in the early stages of a case).

80.     The Debtors' prospects of success in these cases are strong.  For more than a year, the Debtors have worked diligently to reach a consensual, efficient, and value maximizing outcome in these cases.  Through the Settlement Agreement, the Debtors have successfully negotiated to resolve their Estate Causes of Action against Brenntag, DB US, and NICO in exchange for payment of $535 million and the mutual release of any and all claims against the Debtors by these parties.  In the event the Settlement Agreement is approved on a final basis, the Debtors will have sufficient assets to fund claims trusts to be governed by procedures that will provide a fair and efficient process for creditor distributions.

81.     Absent the stay/injunction requested herein, plaintiffs will undoubtedly seek to circumvent the Summary Judgment Order, just as they did with respect to the TRO, by strategically amending their complaints to withdraw the successor liability portions of their claims in order to pursue direct claims against Brenntag that potentially implicate the Debtors' conduct and factually overlap with claims to be resolved by the Settlement Agreement.[37]  Moreover, the requested injunction will ensure that the funds obtained for the benefit of these estates through the Settlement Agreement will be used to satisfy creditor claims, rather than to pay for defense and other litigation costs in the event the Brenntag Enjoined Claims are allowed to proceed, and the Debtors are forced to defend themselves in the tort system.

---

[37] *Accord In re Fed.-Mogul Glob.*, 684 F.3d 355, 359 (3d Cir. 2012) ("Bankruptcy has proven an attractive alternative to the tort system for corporations [facing mass tort claims] because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably."); S. Elizabeth Gibson, Judicial Management of Mass   Tort   Bankruptcy   Cases,   Federal   Judicial   Center,   at   1   (2005),   available   at https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf (noting that "bankruptcy courts have become a forum for companies seeking the resolution of pending and threatened mass tort litigation" and that, as of the publication date, "over seventy companies, motivated primarily by their desire to reach a final resolution of their mass tort liabilities, have sought bankruptcy protection").

82.     To be sure, opposition from tort plaintiffs to the Debtors' Chapter 11 Cases does not undermine the Debtors' ability to satisfy this factor, as objecting parties may later change their minds once negotiations commence in earnest.  *See*, *e.g.*, *In re Aldrich Pump LLC*, No. 20-03041 (JCW), 2021 WL 3729335, at *35 (Bankr. W.D.N.C. Aug. 23, 2021) (rejecting the argument that success was unlikely to success because "the asbestos claimants will never agree to a Plan" and explaining that, "[h]aving sat on two other hotly contested and apparently irreconcilable asbestos bankruptcy cases that wound up with consensual plans as between these constituencies . . . this Court is unable to conclude that our parties cannot reach an agreement, as well"); *In re Purdue Pharms., L.P.*, 619 B.R. 38, 58 (S.D.N.Y. 2020) (affirming section 105 injunction enjoining mass tort claims against non-debtors despite plaintiffs arguing that success was unlikely because plaintiffs intended to oppose the currently proposed chapter 11 plan).

83.     For more than six months, the Debtors participated in Court-ordered mediation with the Contributing Parties, the Committee, and the FCR in a good faith effort to reach a consensual, global, and workable resolution for the benefit of all the Debtors' stakeholders.  That did not happen.  Nevertheless, the Debtors remain open to discussions with the Committee and the FCR and remain hopeful that a fully consensual deal can be reached.  The injunctive relief requested by this Motion, if granted, would further promote negotiations towards a fully consensual resolution in tandem with the Debtors' and Contributing Parties' efforts to obtain approval of the Settlement Agreement, which currently provides the most value-maximizing, efficient, and equitable outcome for the benefit of *all* of the Debtors' stakeholders in these cases.  Accordingly, this factor is satisfied.

B.    **Failure to Enjoin the Brenntag Enjoined Claims Pending Resolution of the Settlement Motion Would Irreparably Harm the Debtors**

84.    In analyzing irreparable harm, the key question is "whether the litigation . . . 'would interfere with, deplete or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan[.]'" *In re W.R. Grace & Co.*, 115 F. App'x 565, 570 (3d Cir. 2004) (first quoting *Robins*, 828 F.2d at 1025, then quoting *Johns-Manville*, 26 B.R. at 436).

85.    Recent Third Circuit authority establishes that the irreparable harm prong of the test for injunctive relief can be satisfied by a showing of potential harm or the risk of harm. *See ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *3 (3d Cir. Apr. 21, 2022). Indeed, this Court has recently clarified that "the mere risk of a potentially adverse impact on a debtor's bankruptcy can be sufficient to support a preliminary injunction" and the "plaintiff's theory that the debtor would not suffer an adverse impact should not be tested at the debtor's peril." *See In re LTL Mgmt., LLC*, 640 B.R. 322, 337 (Bankr. D.N.J. 2022) (stating that a movant may be entitled to a preliminary injunction if movant demonstrates that "the risk of future harm [is] anything other than speculative") (quoting *ADP, Inc. v. Levin*, 2022 WL 1184202, at *3).

86.    In *LTL Management*, this Court determined that the debtor would suffer irreparable harm absent an injunction of talc litigation against non-debtor related parties because of: (i) the debtor's liability for the underlying talc claims; (ii) the debtor's indemnification obligations; and (iii) the potential disruption that continued litigation could cause to the funding of a trust. *See* 638 B.R. at 320.

87.    Similarly, continued prosecution of Brenntag Enjoined Claims will cause irreparable harm to the Debtors. Because the Brenntag Enjoined Claims either include allegations of pre-2004 talc/asbestos exposure or do not provide sufficient information in the underlying

complaint for the Debtors to identify the year in which plaintiff was first allegedly exposed to talc/asbestos, such claims implicate the Debtors' operations prior to the sale of substantially all of their operating assets to Brenntag or do not plead sufficient facts for the Debtors to reasonably assess their impact on these estates.  As such, the adjudication of these claims will require the Debtors to expend scarce estate resources participating in tort system litigation or risk collateral estoppel, *res judicata*, and record taint in such actions.

88.     Moreover, an adverse judgment against Brenntag in connection with a Brenntag Enjoined Claim may give rise to potential claims against the Debtors, either through liability apportionment or by triggering potential indemnification claims.  The Court has already determined that these concerns warrant injunctive relief in its decisions resolving the various disputes in connection with the TRO.

89.     In the TRO Opinion, the Court explicitly recognized that "even direct claims against Brenntag can give rise to indemnification claims depending on the conduct alleged, the timeframes implicated, and the products involved" and therefore "direct claims against Brenntag are not categorically excepted from the relief sought by way of the Adversary Proceeding and the [TRO] Motion."[38]

90.     Following the Court's entry of the TRO, several tort plaintiffs attempted to circumvent the TRO by dismissing the successor liability portions of their claims against Brenntag in actions that include allegations and/or evidence of pre-2004 talc/asbestos exposure and therefore implicate the Debtors' conduct, operations, and potential indemnification obligations to Brenntag. The Court rejected these attempts.

---

[38] TRO Opinion, at p. 9 n. 2.

91.    The plaintiffs in the Lee Action attempted to withdraw all claims and allegations against Brenntag North America, Inc. as successor to the Debtors following the addition of the Lee Action to the TRO.  In response, the Debtors filed the Motion to Enforce TRO on an emergency basis, which the Court granted.

92.    In enforcing the TRO against the plaintiffs in the Lee Action, the Court determined that a plaintiff may not circumvent the TRO by purporting to withdraw Successor Liability Claims against Brenntag when the complaint in the underlying action includes allegations regarding the Debtors' conduct and plaintiff's exposure to talc/asbestos that pre-dates the 2004 Transaction.  In its decision, the Court explained that the TRO is not limited to claims expressly predicated on theories of successor or alter ego liability, but instead encompasses all claims that implicate the Debtors' conduct:

> The TRO entered by this Court attempted to clearly bar continued litigation of claims, not just based on successor liability.
>
> Yes, the summary judgment motion that's pending in the adversary proceeding focuses on ownership of … the successor liability claims. ***But the TRO that was put in place addressed a broader array of claims and it included claims relevant, that spoke to the conduct of the Debtors*** and claims for which there could be possibly indemnification claims asserted by Brenntag against the Debtors.
>
> So, ***those could arise both from the affirmative prosecution of claims or through the assertion of defenses by Brenntag***.[39]

93.    Subsequently, the plaintiffs in the Cooper and Sneider Actions attempted to preemptively circumvent the TRO by dismissing "successor liability claims only" against Brenntag shortly before such actions were added to the TRO.  In extending the TRO to the Cooper and Sneider Actions, the Court made two observations.  *First*, the Court noted that plaintiffs' claims against Brenntag were not Successor Liability Claims within the meaning of the Summary

---

[39] Hearing Tr. 40:13-41:1 (Apr. 26, 2024) (emphasis supplied).

Judgment Opinion because plaintiffs dismissed those claims with prejudice and, following such dismissal, were only pursuing direct claims against Brenntag for its own post-2004 conduct.[40]

94.    *Second*, the Court noted that the claims asserted in the Cooper and Sneider actions potentially impacted the Debtors and therefore still fell within the scope of the TRO.[41]   The Court noted that, "although the claims in the Sneider action are now limited to Brenntag's independent conduct, the facts of the case remain the same, and the potential impact on the Debtors' estate[s] still exists, warranting the debtor to have to decide whether or not to participate and expend resources in defending the action."[42]

95.    The Court analogized the Sneider Action to the Lee Action and held that Ms. Sneider's claims against Brenntag were "precisely the types of claims that were intended to be covered by the initial TRO" given that an adverse judgment in the Sneider Action may give rise to indemnification claims against the Debtors.[43]   The Court also noted that a jury could apportion liability for plaintiffs' injuries to the Debtors given the evidence of pre-2004 talc/asbestos exposure in the record.[44]   Applying the same analysis to the Cooper Action, the Court extended the TRO to both the Cooper and Sneider Actions.

96.    The Court should apply that same logic here with respect to all of the Enjoined Brenntag Claims.   The actions underlying the Enjoined Brenntag Claims either involve allegations of a claimant's pre-2004 talc/asbestos exposure and therefore implicate the Debtors' conduct prior to the sale of substantially all of their operating assets to Brenntag or do not plead sufficient facts

---

[40] Hearing Tr. 24:2-17 (Aug. 22, 2024).

[41] *Id.* at 23:21-24.

[42] *Id.* at 25:21-26:1.

[43] *Id.* at 27:14-18.

[44] *See id.* at 25:13-20.

for the Debtors to reasonably assess their impact on these estates. These actions therefore potentially implicate the Debtors' conduct and operations prior to the sale of substantially all of their assets to Brenntag and would require the Debtors to expend scarce resources defending such actions or risk litigation prejudice through *res judicata*, collateral estoppel, and record taint. Likewise, an adverse judgment against Brenntag may subject the Debtors to liability, either through apportionment by a jury or through the assertion of potential indemnification claims by Brenntag.

97.  The requested injunction is necessary to avoid this irreparable harm. The Settlement Agreement, if approved, resolves Brenntag's liability for the Debtors' conduct and provides for a release of any potential indemnification claims against the Debtors, thereby clearing a path for claimants to pursue Brenntag for direct claims resulting from its independent conduct post-2004 without impacting the Debtors' estates. Accordingly, this factor is satisfied.

**C.   The Irreparable Harm that the Debtors Would Suffer in the Absence of an Injunction Substantially Outweighs Any Prejudice to Plaintiffs**

98.  As described above, the Debtors would suffer substantial and irreversible harm if the requested injunctive relief is not granted. Prosecution of Brenntag Enjoined Claims prior to entry of (a) a final, non-appealable Order granting the Settlement Motion or (b) an Order denying the Settlement Motion may liquidate claims against the Debtors (whether through liability apportionment or potential indemnification claims) and subject the Debtors' estates to substantial defense costs or bind the Debtors with respect to rulings, judgments and evidentiary records established in those cases. It would also compromise the protections of the automatic stay.

99.  In contrast, any prejudice to the plaintiffs caused by an injunction would be minimal, to the extent any would exist at all. As an initial matter, 657 of the 684 actions listed on the Schedule of Enjoined Brenntag Claims (*i.e.* 96% of such actions) are expressly pled as

Successor Liability Claims against Brenntag.  These claims are already subject to the automatic stay pursuant to the Summary Judgment Order.  Therefore, entry of the Temporary Restraining Order and Preliminary Injunction Order as to the overwhelming majority of Brenntag Enjoined Claims would serve only to prevent plaintiffs from strategically amending their claims to circumvent the Summary Judgment Order in a manner similar to the unsuccessful attempts made by the plaintiffs in the Lee, Cooper, and Sneider Actions with respect to the TRO.

100.    Plaintiffs in the remaining 27 actions listed on the Schedule also will not suffer substantial harm because those plaintiffs are similarly situated to the plaintiffs in the Lee, Cooper, and Sneider Actions.  Although these plaintiffs do not expressly allege Successor Liability Claims against Brenntag, the complaints in all but two of these actions contain express allegations of pre-2004 talc/asbestos exposure, and therefore clearly implicate the Debtors' conduct and business operations, warranting their injunction.  The two actions[45] that are not expressly pled as Successor Liability Claims and do not specifically allege pre-2004 talc/asbestos exposure do not plead sufficient information for the Debtors to identify the year plaintiffs were first allegedly exposed to talc/asbestos in order to reasonably assess their impact on these estates.  The Debtors included these actions on the Schedule as Brenntag Enjoined Claims based on the potential for such claims to subject the Debtors to indemnification risk and litigation prejudice.

101.    "[I]t is well established that mere delay is insufficient to prevent the issuance of an injunction."  *Bestwall*, 606 B.R. at 257; *see also In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997) (finding that delay to the enjoined party from pursuing remedies was heavily outweighed by potential harm to debtor's efforts in its bankruptcy case).  In its August 22 bench

---

[45] These two actions are styled (i) *Granchelli v Asral Health & Beauty, Inc., et al.*, Case No. MID-L-002784-23 (N.J. Super Ct.) and (ii) *Olson-Rizzo v. American Art Clay Co., Inc.*, Case No. 190018/2022 (N.Y. Sup. Ct.).

ruling extending the TRO to the Sneider and Cooper Actions, the Court made clear that it was not willing to extend the TRO indefinitely, and any further extensions must be tied to an "exit strategy" for these Chapter 11 Cases.[46]

102.    By the injunctive relief sought herein, the Debtors are not seeking to permanently enjoin plaintiffs from prosecuting direct claims against Brenntag for Brenntag's independent post-2004 conduct.  To the contrary, the Debtors are merely seeking to temporarily halt those claims (all of which either include allegations of pre-2004 talc/asbestos exposure or are silent as to when plaintiff was first allegedly exposed) while the Debtors seek final approval of the Settlement Agreement.  If approved on a final basis, the Settlement would fully resolve Brenntag's liability for the Debtors' pre-2004 conduct in exchange for a substantial contribution to these estates, release any potential indemnification claims against the Debtors, and clear a path for plaintiffs to proceed against Brenntag on direct claims relating to their post-2004 talc/asbestos exposure.

103.    The Schedule Removal Procedures proposed herein further alleviate any burden imposed on plaintiffs through the requested stay/injunction.  That is because any plaintiff who believes his or her claim against Brenntag does not constitute a Brenntag Enjoined Claim—either because (i) such claim constitutes a purely direct claim based solely on plaintiff's post-2004 talc/asbestos exposure or (ii) plaintiff has dismissed all claims against Brenntag, including direct claims, with prejudice—may utilize the Schedule Removal Procedures to seek to have his or her claim removed from the Schedule.

104.    Accordingly, for the reasons set forth above, the balance of harms weighs in favor of the Debtors and this Court's issuance of the requested injunction.

---

[46] *See* Hearing Tr. at 28:4-29:15 (Aug. 22, 2024).

**D.      The Public Interest Favors the Requested Injunction**

105.      Courts have consistently recognized the public interest in a successful chapter 11
case. *See*, *e.g.*, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983); *Sudbury*, 140 B.R.
at 465; *see also Johns-Manville*, 26 B.R. at 428 ("[T]he goal of removing all obstacles to plan
formulation [is] eminently praiseworthy and [this court] supports every lawful effort to foster this
goal while protecting the due process rights of all constituencies.").

106.      Here, the requested injunction will allow the Debtors and Brenntag to focus their
efforts on obtaining final Court approval of the Settlement Agreement, which agreement would
provide a source of substantial funding for a confirmable chapter 11 plan that maximizes the value
of the Debtors' assets (including Estate Causes of Action) and provides equitable distributions to
the Debtors' creditors. *W.R. Grace*, 386 B.R. at 36 (extending injunction to cover a non-debtor
where bankruptcy would "resolv[e] thousands of claims in a uniform and equitable manner."); *In
re Dow Corning I*, 211 B.R. 545, 588 (Bankr. E.D. Mich. 1997) ("[I]t is anything but just when
presenting the identical proofs, one plaintiff suffering nearly identical injuries or illness[] wins a
multimillion dollar verdict against a defendant while another takes nothing.").

107.      Accordingly, for the foregoing reasons, each of the four factors clearly weighs in
favor of this Court issuing a preliminary injunction prohibiting Defendants from continuing,
amending, and settling of Brenntag Enjoined Claims pending the Court's entry of (a) a final, non-
appealable Order granting the Settlement Motion or (b) an Order denying the Settlement Motion.

**IV.      The Court Should Approve the Procedures**

108.      The Debtors anticipate that additional actions asserting Brenntag Enjoined Claims
will be commenced following the Court's entry of the Preliminary Injunction Order (in the event
the Motion is granted). To conserve the Debtors' and the Court's resources, and to avoid the need
for unnecessary motion practice and hearings, the Debtors propose the following Schedule

Amendment Procedures, pursuant to which the Debtors may seek to amend the Schedule to stay/enjoin additional Brenntag Enjoined Claims:

     i.    So long as the Preliminary Injunction Order remains in effect, the Debtors shall be permitted to file on the docket in the Adversary Proceeding a request to amend or supplement the Schedule to add additional Brenntag Enjoined Claims (a "**Request to Amend Schedule**"), which shall attach (a) a proposed order amending the Schedule (an "**Order Approving Amendment**"), (b) an amended or supplemented Schedule that identifies the additional actions sought to be stayed/enjoined (such actions, "**Additional Actions**"), (c) a blackline of such Schedule marked against the previously filed Schedule, and (d) a copy of the operative complaint and any bifurcation stipulation filed in each Additional Action.

    ii.    Any Request to Amend Schedule shall be served by regular mail and email (where known) on counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, and counsel for any individual plaintiff identified on the Schedule (as amended or supplemented) (each, an "**Amendment Notice Party**" and collectively, the "**Amendment Notice Parties**") within one (1) business day of its filing.

    iii.    Objections, if any, to a Request to Amend Schedule, which shall be limited to arguing that the plaintiff's claims against Brenntag in the relevant Additional Action constitute purely direct claims based solely on plaintiff's post-2004 talc/asbestos exposure (each, an "**Objection**"), shall be filed and served by first class mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US within ten (10) days of service of the applicable Request to Amend Schedule.

    iv.    Any Amendment Notice Party that fails to timely file an Objection shall be deemed to consent to entry of the Order Approving Amendment as to the Additional Action(s) identified in the applicable Request to Amend Schedule.

    v.    In the event an Amendment Notice Party timely files an Objection, the parties shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Objection at a hearing to be scheduled.

109.    The Debtors appreciate that certain plaintiffs may believe their claims against Brenntag do not constitute Brenntag Enjoined Claims, either because (i) such claims constitute purely direct claims based solely on plaintiff's post-2004 talc/asbestos exposure, or (ii) plaintiff has dismissed all of his or her claims against Brenntag, including direct claims, with prejudice. To

avoid any prejudice to such plaintiffs, the Debtors propose the following Schedule Removal

Procedures, which are substantially similar to the Schedule Amendment Procedures:

    i.    So long as the Preliminary Injunction Order remains in effect, any plaintiff whose action is listed on the Schedule and (i) who has dismissed with prejudice all claims against Brenntag, including direct claims, in the subject action; or (ii) whose claims against Brenntag constitute purely direct claims based solely on such plaintiff's post-2004 talc/asbestos exposure, either because (a) plaintiff's initial exposure to talc/asbestos occurred after February 27, 2004 or (b) prior to February 28, 2024, plaintiff was exposed to talc/asbestos supplied solely by parties other than the Debtors, shall be permitted to file on the docket in the Adversary Proceeding a request to remove his or her action from the Schedule (a "**Removal Request**"), which shall (x) identify the specific action plaintiff seeks to remove from the Schedule and (y) provide evidence sufficient to establish that plaintiff satisfies one of the above conditions.

    ii.    Any Removal Request shall be served by regular mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US (each, a "**Removal Notice Party**" and collectively, the "**Removal Notice Parties**") within one (1) business day of its filing.

    iii.    Objections, if any, to a Removal Request (each, an "**Objection**"), shall be filed and served by first class mail and email (where known) on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, and counsel for the applicable plaintiff within ten (10) days of service of the applicable Removal Request.

    iv.    Any Removal Notice Party that fails to timely file an Objection shall be deemed to consent to the removal of the action identified in the applicable Removal Request from the Schedule.

    v.    In the event a Removal Notice Party timely files an Objection, the parties shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Objection at a hearing to be scheduled.

110.    The Debtors submit that these Procedures are a reasonable and efficient means to

provide the Debtors with the ability to seek periodic amendments to the Schedule as needed

without prejudice to the applicable plaintiffs' rights to object to same, and to provide plaintiffs

with the ability to seek expeditious relief from the Preliminary Injunction Order.

111.    The Debtors will serve a copy of this Motion and the Preliminary Injunction Order on counsel for the TCC, FCR, Brenntag, NICO, DB US, and *all* counsel for the Tort Claimants listed on Appendix A to the Amended Complaint regardless of whether their clients are currently listed on the Schedule.  These parties will have a full and fair opportunity to object to the relief requested herein (including with respect to the Procedures).  Thereafter, any Request to Amend Schedule will be served on counsel for the TCC, FCR, Brenntag, NICO, DB US, and counsel for the additional plaintiffs listed on the Schedule.

112.    Accordingly, the Procedures are not prejudicial to any party in this Adversary Proceeding, and the Court should enter the Preliminary Injunction Order and approve the Procedures proposed herein.

## REQUEST FOR TEMPORARY RESTRAINING ORDER

113.    The Debtors request this Court's entry of the Temporary Restraining Order enjoining the Brenntag Enjoined Claims pending the Court's decision on the preliminary injunction sought by this Motion.  As discussed *supra*, the overwhelming majority of Brenntag Enjoined Claims are already subject to the automatic stay pursuant to the Summary Judgment Order.  A Temporary Restraining Order is necessary to prevent plaintiffs from preemptively amending their complaints (all of which either include allegations of pre-2004 talc/asbestos exposure or are silent as to when plaintiff was first allegedly exposed) to circumvent the Summary Judgment Order and injunctive relief sought herein.

114.    The small minority of Brenntag Enjoined Claims that are not expressly pled as Successor Liability Claims either contain allegations of pre-2004 talc/asbestos exposure in the underlying complaint or do not provide sufficient information in the underlying complaint for the Debtors to identify the year in which plaintiff was first allegedly exposed to talc/asbestos and therefore make a reasonable determination as to the impact on these estates.  Accordingly, these

actions fit squarely within the scope of the Court's rulings subjecting the Lee, Cooper, and Sneider Actions to the TRO.

115.    Now that the Debtors have reached a proposed resolution of their Estate Causes of Action against Brenntag and the other Contributing Parties by way of the Settlement Agreement, a Temporary Restraining Order pending a ruling on the injunctive relief requested herein is both reasonable and appropriate.  In the event the Settlement Agreement is approved on a final basis, Brenntag's indirect liability for the Debtors' conduct will be fully resolved in exchange for a substantial contribution to these estates and Brenntag's mutual release of claims (including potential indemnification claims) against the Debtors.  Accordingly, a Temporary Restraining Order of all Brenntag Enjoined Claims pending the Court's decision on this Motion is necessary to avoid the same irreparable harm to the Debtors' estates that supports the entry of the Preliminary Injunction Order.

116.    Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure (made applicable to this Adversary Proceeding by Rule 7065 of the Federal Rules of Bankruptcy Procedure), the Debtors request that the Court schedule a combined hearing on the Debtors' request for a preliminary injunction pursuant to this Motion with the trial on Counts II and III of the Complaint (as amended by the Amended Complaint) before the expiration of the Temporary Restraining Order.

## <u>NO BOND REQUIRED</u>

117.    Pursuant to Federal Rule of Bankruptcy Procedure 7065, in adversary proceedings, a temporary restraining order or preliminary injunction "may be issued on application of a debtor, trustee, or debtor in possession without" posting a bond.  *In re Team Sys. Int'l, LLC*, No. 22-10066 (CTG), 2023 WL 1428572, at *13 (Bankr. D. Del. Jan. 31, 2023) (entering an injunction without requiring a bond).

## NOTICE

118.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel for all known Defendants in this Adversary Proceeding; (iii) counsel for the Committee; (iv) counsel for the FCR; and (v) the parties listed on the Core Service List.  The Debtors submit that no other or further notice of this Motion need be provided.

## CONCLUSION

**WHEREFORE**, the Debtors request that the Court: (i) enter the Preliminary Injunction Order, substantially in the form attached hereto as **Exhibit A**, (a) enjoining the continuation, amendment, and settlement of Brenntag Enjoined Claims pending (x) a final, non-appealable Order granting the Settlement Motion or (y) an Order denying the Settlement Motion and (b) approving the Procedures; (ii) enter the Temporary Restraining Order, substantially in the form attached hereto as **Exhibit B**, enjoining such claims pending the Court's decision on this Motion; and (iii) grant the Debtors such other and further relief as the Court deems just and proper.

***[Remainder of page intentionally left blank]***

Dated: September 11, 2024

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

-and-

Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone:  (212) 752-8000
Email:      svanaalten@coleschotz.com
            adeleo@coleschotz.com

-and-

G. David Dean, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Email:      ddean@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*